## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## LAREDO DIVISION

|   |   |
|---|---|
| In re: | ) Chapter 11 |
| 4E BRANDS NORTHAMERICA, LLC,[1] | ) Case No. 22-50009 |
| Debtor. | ) |

**DECLARATION OF DAVID M. DUNN, CHIEF RESTRUCTURING OFFICER, IN SUPPORT OF THE CHAPTER 11 PETITIONS AND THE FIRST DAY MOTIONS**

I, David M. Dunn, being duly sworn, depose and say:

1. I am the Chief Restructuring Officer ("CRO") of 4E Brands Northamerica, LLC (the "Company," "Brands," or "Debtor"). I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtor.

2. I have served as the Chief Restructuring Officer of the Debtor since December 7, 2021. Since then, I have become generally familiar with the Debtor's day-to-day operations, businesses, and financial affairs.

3. I am also a Principal at Province, LLC ("Province"), a nationally recognized financial advisory firm focusing on growth opportunities, restructurings, and fiduciary-related services. I am a seasoned corporate restructuring professional with over 20 years of experience in high-profile board, buyside, and advisory roles. My background includes large and complex financial restructurings, operational transformations, mergers and acquisitions, interim management, distressed financings, and litigation-orientated investments.

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is 4E Brands Northamerica, LLC (0310).

1

**EXHIBIT 1**

4.     Over the course of my twenty (20) year career, I have served as a Chief Restructuring Officer, advisor to or member of Boards of Directors, Litigation and Liquidation Trustee, Plan Administrator and Examiner. Before joining Province, I executed principal investments in distressed debt and equity instruments across a diverse range of industries, first at Arrowgrass Capital Partners and then at Cross Sound Management, a corporate distressed investment firm that I co-founded. I began my career practicing law within the financial restructuring departments of Sidley Austin LLP and then Akin Gump Strauss Hauer & Feld LLP. My experience includes global engagements across a broad range of industries, including power, upstream E&P, E&P services, metals and mining, monoline and mortgage insurance, media, gaming, and retail.

5.     To minimize any disruption to the Debtor's operations and to ensure a smooth transition into chapter 11, the Debtor requests various types of relief in "first day" motions (collectively, the "<u>First Day Pleadings</u>") in connection with the Debtor's above-referenced chapter 11 case (the "<u>Chapter 11 Case</u>").[2] I submit this Declaration in support of the Debtor's (a) voluntary petition for relief under chapter 11 of title 11 of the United States Code and (b) the First Day Pleadings.

6.     This Declaration is divided into two parts. Part I provides background information about the Debtor, its business operations, its corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Case. Part II sets forth the relevant facts in support of each of the First Day Pleadings.

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

**EXHIBIT 1**

# PART I - BACKGROUND

A. **The Debtor's Background**

7. The Debtor is a Texas limited liability company formed on May 19, 2014. It is wholly owned by 4E Global S.A.P.I. de C.V. ("Global" and, together with the Debtor, "4E"), a subsidiary of Kimberly-Clark de México, S.A.B. de C.V. ("Kimberly-Clark Mexico" or "KCM"). The Debtor is no longer operating. It filed this Chapter 11 Case to fully wind down its business.

8. With a focus on personal care and hygiene products, the Debtor contracted to manufacture and then distributed personal care products throughout the United States. The Debtor's brand name products include Blumen Hand Sanitizer, Assured Hand Sanitizer, and various other hand sanitizers and hand soaps. The Debtor warehoused and distributed its products to third-party vendors, including large national retailers, which then sold and further distributed the Debtor's products throughout the United States.

B. **Events Leading to the Chapter 11 Cases**

9. At the onset of the COVID-19 pandemic in early 2020, the demand for hand-sanitizer products drastically increased. This uptick in demand placed a significant strain on the supply chain, including the availability of primary raw materials used in the manufacturing of the Debtor's products. The U.S. Food & Drug Administration ("FDA") reacted by issuing a guidance that permitted the manufacturer of alcohol-based sanitizers by producers that were not registered as hand sanitizer manufacturers in the United States.[3] *See FDA's Temporary Policy for Preparation of Certain Alcohol-Based Hand Sanitizer Products During the Public Health Emergency (COVID-19) issued March 2020.*

---

[3] The FDA has since withdrawn its temporary guidance for alcohol-based hand sanitizers as a result of an increased supply of hand sanitizer since the start of the COVID-19 pandemic.

**EXHIBIT 1**

10. As a result of the increased demand and the FDA's temporary policy and to meet the demand for hand sanitizer during the COVID-19 pandemic, 4E accepted new ethanol suppliers. Like many other hand sanitizer distributors, the manufacturer of the products distributed by the Debtor sourced some of its raw ingredients from opportunistic supplier(s) who, whether intentionally or mistakenly, provided methanol instead of ethyl alcohol.

11. The Debtor did not know of the substitution. It believed ethanol was used to manufacture the hand sanitizer it distributed. The hand sanitizer was labeled as containing ethanol as an active ingredient. In fact, it contained methanol.

12. In June 2020, the FDA issued an initial warning to consumers about hand sanitizer products that contained methanol. On July 2, 2020, the FDA released a statement warning consumers about the potential harm of using hand sanitizes containing methanol, including certain of the Debtor's products.[4] On July 8, 2020, the FDA added the Debtor's hand sanitizer to the list of hand sanitizer products contaminated with methanol. As a result, the FDA recommended that the Debtor issue a recall and imposed an import ban on many of the Debtor's products.

13. On July 12, 2020, the Debtor issued a voluntary recall of certain of its products due to the potential presence of methanol.[5] A few weeks later, on July 24, 2020, the Debtor issued recalls on all of its hand sanitizer products.[6] The recall included all Debtor distributed products within expiration, regardless of size, UPC, or lot number.

14. As a result of the contamination and subsequent recall, the Debtor's business operations halted. The majority of its inventory was deemed worthless and the Debtor faced

---

[4] https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-hand-sanitizers-consumers-should-not-use

[5] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/4e-brands-north-america-issues-nationwide-voluntary-recall-hand-sanitizer-due-potential-presence

[6] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/4e-brands-north-america-issues-expanded-nationwide-voluntary-recall-hand-sanitizer-due-potential

**EXHIBIT 1**

multiple class action, personal injury, and wrongful death lawsuits, as well as customer demands for refunds or replacement products. Additionally, the Debtor is working to comply with FDA requirements for both the recalled contaminated and non-contaminated hand sanitizer.

15. The Debtor is storing all of its recalled hand sanitizer in various warehouses in the United States, including Laredo, Texas. The Debtor is working to destroy all of the contaminated hand sanitizer. Aditionally, the Debtor is working to export all non-contaminated product to Global in Mexico. The Debtor continues to report to the FDA on the status of the destruction and exportation and will continue this process throughout this Chapter 11 Case. The Debtor intends to file a motion that will outline a process to facilitate the destruction and exportation process pursuant to FDA requirements.

16. In December 2021, I was retained as CRO of the Debtor and I engaged Province as financial advisor. I retained Jackson Walker LLP as legal counsel (collectively with myself and Province, the "Advisors"). Throughout December, the Advisors evaluated strategic alternatives available to the Company.

17. The Debtor ultimately decided it was necessary to file chapter 11 to consummate an orderly liquidation of the estate and adequately deal with all outstanding claims against the Debtor. On February 22, 2022 (the "Petition Date"), the Debtor filed for chapter 11 bankruptcy protection in the Southern District of Texas.

**C.  Debtor in Possession Financing**

18. To facilitate funding the Debtor's Chapter 11 Case and winddown, the Debtor negotiated debtor in possession financing (the "DIP Financing") from Global (the "DIP Lender"). Prior to the Petition Date, the Debtor and Global (and their respective advisors) engaged in arm's-length negotiations regarding the terms and conditions of the proposed DIP Financing. The DIP Financing Term Sheet between the Debtor and Global (the "DIP Term Sheet"), attached as

**EXHIBIT 1**

**Exhibit A**, provides the Debtor with a $2.5 million multi-draw debtor-in-possession term loan consisting of (a) $2 million of the interim DIP amount to be made available upon the Bankruptcy Court's entry of the Interim DIP Order (as further explained and defined in the DIP Term Sheet) and (b) $500,000 of the final DIP amount to be made available upon entry of the Final DIP Order (as further explained and defined in the DIP Term Sheet).

19. As part of the DIP Term Sheet, the Debtor must meet certain milestones ("Milestones") to comply with the agreement. The Milestones include:

    (a) not later than February 22, 2022, commence the Debtor's Chapter 11 Case in the Bankruptcy Court (the date of commencement of the Chapter 11 Cases, the "Petition Date") and file the DIP Motion and other First Day Motions;

    (b) not later than February 23, 2022, obtain entry of the Interim DIP Order;

    (c) not later than March 25, 2022, obtain entry of the Final DIP Order by the Bankruptcy Court;

    (d) not later than May 4, 2022, obtain entry of an order confirming a Plan of Liquidation.

    (e) not later than May 19, 2022, achieve substantial consummation of the proposed Chapter 11 plan of liquidation

20. All milestones may be waived with the written consent of the DIP Lender.

## PART II- FIRST DAY PLEADINGS

21. I reviewed each of the First Day Pleadings and proposed orders (including any attached exhibits). The facts set forth therein are true and correct to the best of my knowledge, information, and belief. The relief sought in each of the First Day Pleadings (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with minimum disruption to its business and minimum loss of productivity or value, and (b) constitutes a critical element in maximizing value during the Chapter 11 Case.

31485900v.6

6

**EXHIBIT 1**

22. **Application to Appoint Claims and Noticing Agent**. The Debtor needs a claims and noticing agent to help the Debtor provide notice to creditors and parties in interest throughout this Chapter 11 Case. The Debtor has chosen Stretto, Inc. ("Stretto") to serve as its claims and noticing agent. Stretto has a multitude of experience serving as a claims and noticing agent in various chapter 11 cases throughout the United States, many in the Southern District of Texas. The Debtor intends to utilize Stretto to (a) serve as the noticing agent to mail notices to the estate's creditors, equity security holders, and other parties in interest; (b) provide computerized claims, objection, solicitation, and balloting related services; and (c) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to this chapter 11 case.

23. **Cash Management**. With one active bank account, the Debtor's Cash Management System (as defined in the *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to Continue to Operate Its Cash Management System and Maintain Existing Bank Accounts*) is simple. The Debtor has two bank accounts: one account ending in 7518 at Citibank, and a second account ending in 0160 at Comerica (collectively, the "Bank Accounts"). Both Bank Accounts are held at FDIC-insured depositories which are on the U.S. Trustee's List of Approved Depositories. The Citibank Bank Account was opened in 2020, however, the Debtor has never used this account as part of its cash management system. The Citibank Bank Account maintains a nominal balance only to cover bank fees. All cash flows through the Debtor's Comerica Bank Account. The Debtor requests authorization to continue to use its Cash Management System on a postpetition basis. Due to the Debtor's wind-down status, maintenance of its current Cash Management System will allow the Debtor to focus on this Chapter 11 Case, destruction and exportation of the hand sanitizer, and fully winding down its business.

24. **Motion to Approve DIP Financing and Approve Use of Cash Collateral**. The DIP Financing is necessary to fund the costs associated with the Debtor's bankruptcy proceeding, destruction and exportation of its hand sanitizer, confirmation of a chapter 11 plan of liquidation, and a final wind-down of its business. The terms of the DIP Financing were the result of arms' length negotiations between sophisticated parties represented by experienced counsel. I believe, in the exercise of the my business judgment, that the terms of the DIP Financing are fair, equitable, and in the best interest of the Debtor's estate. The Debtor will suffer immediate and irreparable harm if it does not obtain financing.

25. I do not believe that there are any parties willing to provide financing on terms more favorable than those contained in the proposed financing, including financing in the form of unsecured credit allowable under Section 503(b)(1) or as an administrative expense under Section 364(a) or (b). Approval of the DIP Financing on the terms set forth in the DIP Term Sheet will provide the Debtor with immediate access to funds necessary to fund this Chapter 11 Case and fully wind down. Without access to sufficient funds to pay these costs, the Debtor cannot wind up its affairs and comply with orders from government authorities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: February 22, 2022

        By:     /s/ David M. Dunn
        Name: David M. Dunn

**EXHIBIT 1**