| | |
|---|---|
| **From:** | Freeman, Liz |
| **Sent:** | Friday, August 27, 2021 1:15 PM |
| **To:** | Cowlishaw, Pat |
| **Subject:** | RE: Request for Opinion [IMAN-JWDOCS.FID560826] |
| | |
| **Sensitivity:** | Private |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Pat,

I reviewed the letter and have no questions or issues. I deeply appreciate the time and effort everyone has put into this very difficult situation. I lament that it was necessary. Thank you for everything.

- Liz

**From:** Cowlishaw, Pat <pcowlishaw@jw.com>
**Sent:** Thursday, August 26, 2021 12:57 PM
**To:** Freeman, Liz <efreeman@jw.com>
**Subject:** Request for Opinion [IMAN-JWDOCS.FID560826]
**Importance:** High
**Sensitivity:** Private

Liz,

Enclosed is a draft letter to Peter Jarvis, who is engaged by Jackson Walker to advise us from time to time regarding professional ethics matters. (Peter is a partner at Holland & Knight, where he leads a practice group in the area of legal professional ethics and risk management. He is co-author of *The Law of Lawyering*, a leading treatise on the subject).

The draft has been reviewed by Wade, Matt C, and Bruce, and it incorporates their comments. I will appreciate your review. I want to be sure that the statements of fact are accurate and that the terms described in the letter that will apply to you are consistent with what you have understood and can go along with.

Once we have your concurrence, I will sent the letter to Peter in draft form, to be sure it provides the information he needs, after which I will send in final form and look for his opinion.

Please let me know if you have questions. I can say for Wade and me that we know that this has been an extraordinarily difficult matter to ask you to address, that we deeply appreciate your candor, cooperation and your commitment to the firm, and that we look forward very soon to closing the book on this. I would add Matt and Bruce, but you know that they feel that way already. Many thanks.

Pat



Patrick R Cowlishaw
(Direct Dial)
(Direct Fax)

# DRAFT

August __, 2021

*Privileged and Confidential – Attorney-Client Communication*

Mr. Peter Jarvis
Holland & Knight LLP
601 Southwest 2nd Avenue #1800
Portland, Oregon 97204

      Re:    Judicial Disqualificaiton Matter

Dear Peter:

      This letter concerns the relationship between one of our law firm's partners and a federal bankruptcy judge, which you and I have discussed on several occasions going back to March of this year. I describe below the pertinent circumstances and the measures that the firm and our partner have taken in response. On behalf of Jackson Walker, I ask for your advice regarding the propriety and sufficiency of these measures, both in terms of our professional ethical posture and minimizing the risk that the firm's participation in future contested matters before the judge, through our partner or others, might result in disqualification of the judge or of us.

**Background**

      Elizabeth Freeman joined Jackson Walker as a partner in our bankruptcy practice group on May 14, 2018. As with virtually all lateral partner hires, she joined the firm as an "income partner" (salaried). Elizabeth had been a licensed Texas lawyer for 20 years at that time. For the six years preceding her joining Jackson Walker, Elizabeth had worked as a law clerk to Chief Bankruptcy Judge David R. Jones of the Bankuptcy Court of the United States for the Southern District of Texas, Houston Division. Prior to her clerkship, Elizabeth had been a partner in the bankrupty practice of Porter Hedges in Houston. Prior to his taking the bench October 1, 2011, Judge Jones and Elizabeth were law partners at Porter Hedges. Consistent with this background, Elizabeth and Judge Jones were and remain close personal friends. Both individuals are, and at all relevant times have been, divorced.

      Elizabeth enjooyed quick and substantial success at Jackson Walker. From the time of her arrival through today, Houston has became a favored venue for complex debtor cases, in the

Mr. Peter Jarvis
August __, 2021
Page 2

energy industry and more broadly. Complex cases filed in the Southern District are assigned either to Judge Marvin Isgur or Judge Jones. Jackson Walker's debtor practice grew very substantially during this time, including cases in which we took an expansive local counsel role, with Kirkland Ellis acting as lead counsel, and cases in which we were lead debtor's counsel. Much of this work was in cases before either Judge Isgur or Judge Jones. This success was a team effort, involving other bankruptcy partners as well, but Elizabeth's leadership and contribution were recognized as integral. Throughout, Elizabeth adhered to guidelines set by Judge Jones in respect of her status as his former law clerk. Under those guidelines, she could and did work on cases in his court, and the firm's fees for her work could be included in fee applications that came before him for review, but she could not (and did not) appear in his court or sign pleadings to be filed in his court. Elizabeth's understanding has been that Judge Jones expects those guidelines to apply to her for at least as long as the six years she served as his clerk, i.e., at least through May 2024.

In view of her success and contributions, Elizabeth was elected an equity partner in the firm, effective January 1, 2021.

**Van Steelen/McDermott Claim**

Among our debtor cases in progress early this year was a Chapter 11 reorganization proceeding for McDermott International, where we acted as local counsel with Kirkland as lead, and Judge Jones presiding. *In re McDermott International, Inc.,* Case No. 20-30336. In that proceeding Michael Van Deelen, a McDermott shareholder, pursued a *pro se* adversary action against certain Kirkland officers, complaining of actions they had taken in the bankruptcy. *Michael Van Deelen v. David Dickson,* et al., Adversary No. 20-3309. Van Deelen had moved to recuse Judge Jones, citing adverse rulings as evidence of bias. That motion was set for hearing March 10, 2020.

On Saturday, March 6, 2021, Van Deelen sent an e-mail to Matt Cavenaugh, a JW bankruptcy partner who was leading our work in the McDermott case. Van Deelen claimed to have received a "most disturbing communication," which indicated that Elizabeth Freeman had had a romantic relationship with Judge Jones. Van Deelen questioned whether Judge Jones was favoring Jackson Walker and its clients because of his relationship with our partner. Van Deelen provided a copy of what he said was the referenced communication, in the form of an anonymous, unsigned letter, accompanied by an envelope with no return address.

Matt promptly contacted me as the firm's general counsel. We conferred with our managing partner and another long-time firm leader, one of our senior trial partners, that weekend. The latter reached out to Elizabeth, who confirmed that there had been a romantic relationship. No further details were sought at that time. At the firm's request, Elizabeth stopped work on all matters in Judge Jones' court, pending the firm's assessment of the matter.

One of our lawyers delivered a courtesy copy of the Van Deelen communication to Judge Jones' chambers. We also disclosed these matters to our Kirkland co-counsel, who disclosed

Mr. Peter Jarvis
August __, 2021
Page 3

them to the client.  At Judge Jones' request, Judge Isgur presided at the hearing on the motion.  Kirkland appeared on behalf of McDermott and argued at the virtual hearing March 10.  Judge Isgur denied the motion, based on Van Deelen's failure to present any competent evidence in support of his allegations, and he ordered that the anonymous letter Van Deelen had proffered be sealed.  Van Deelen subsequently sought mandamus relief, which was denied.

**Jackson Walker Review**

With the Van Steelen matter resolved, the firm undertook a more complete assessment.  From a legal standpoint, we reviewed judicial disqualification precedent inside and outside the Fifth Circuit based on relationships between counsel and judges, as well as opinions and commentary on relevant ethics requirements applicable to lawyers and the distinct requirements applicable to judges.  I also conferred with you, beginning on March 8, and continuing from time to time as we learned more facts and were able to confer within firm management.  Factually, our managing partner has met with Elizabeth on several occasions, both to better understand the relationship, in particular on a current and going-forward basis, and to keep her apprised of firm management's thinking.

Elizabeth has confirmed that there is no current romantic relationship between herself and Judge Jones and that none is expected going forward.  According to Elizabeth, there has been no romantic relationship since prior to the time in March 2020 when COVID caused so many of us to shift to remote work and virtual-only meetings.  Judge Jones and Elizabeth each own their own homes; they do not and have not lived together.

The firm, for its part, had concluded and has advised Elizabeth that any romantic, intimate, or sexual relationship between a firm lawyer and a federal judge would create too much risk of disqualification to be compatible with any lawyer in the firm continuing to appear before that judge.  There is direct authority that a lawyer appearing before a judge with whom he or she is in a romantic relationship is cause for immediate disqualfication of the judge.  *In re Schwarz,* 255 P.3 299 (N.M. 2011).  *See*  ABA Opinion No. 488 at 6 (2018).  While we found no authority regarding judicial disqualification based on the appearance of a lawyer whose law partner has a romantic relationship with the judge, but does not herself appear, the Fifth Circuit has taken a strict approach to disqualifying judges based on other kinds of prohibited relationships between a judge and an equity partner of the lawyer who is appearing before the judge.  *In re Billedeaux,* 972 F.2d 104 (5th Cir. 1992); *Potashnik v. Port City Const. Co.,* 609 F.2d 1101 (5th Cir. 1980).

We understand that a close personal relationship remains.  We expect that Elizabeth and Judge Jones may see one another socially as friends with some frequency.  They enjoy shared interests.  Elizabeth assures us that at all times since she left her clerkship and joined Jackson Walker, she and Judge Jones have avoided any discussion of active cases and will continue to do so.  With these facts as context, we understand the ethics authorities to agree that a friendship between lawyer and judge is not disqualfying.  ABA Opinion No. 488 at 5.  As stated by the Seventh Circuit:  "In today's legal culture friendships among judges and lawyers are common.  They are more than common; they are desirable. . . . Many courts therefore have held that a

Mr. Peter Jarvis
August __, 2021
Page 4

judge need not disqualify himself just because a friend – even a close friend – appears as a lawyer." *United States v. Murphy,* 768 F.2d 1518, 1537 (7th Cir. 1985).

The cases we have reviewed treat friendship relationships as a matter of degree.  In an extreme circumstance, such as a judge and trial lawyer who frequently vacation together, including shortly after a trial in which the lawyer had appeared before the judge, a close friendship might provide grounds for disqualification.  As long as such extremes are avoided, however, we do not understand a continuing close friendship between Elizabeth and Judge Jones to create a basis for disqualifying Judge Jones when Jackson Walker represents clients in his court, through other lawyers or Elizabeth herself.

**Recommended Actions**

After careful consideration of all of these matters, the firm's Management Committee concluded that it would be prudent to maintain separation between Elizabeth and our firm's representation of clients in matters before Judge Jones for some reasonable time following the conclusion of any romantic relationship, and to adjust her compensation during that time so that she does not receive any portion of the profits that may be earned by the firm attributable to cases before him.  The objective of these actions is to place any alleged appearance of impropriety well into the past.

More specifically, the Management Committee has determined to take the following steps:
,
1)      Continue to require Elizabeth to refrain from working on matters in Judge Jones' court through March 2022, at which point it will have been at least two years since the relationship returned to one of close friendship alone.  Since the firm first became aware of this issue last March, Elizabeth has done more than avoid appearing in Judge Jones' court; she has, at our request refrained from all work on any matters before Judge Jones.  With the firm's concurrence, she has continued to work on complex bankrupcty matters that are planned to be filed in Houston, prior to the filing of a bankruptcy petition.  That is, Elizabeth has worked during the planning stages on cases that may wind up being assigned to Judge Jones after they are filed, but she has refrained from further work once a case is filed if it is assigned to Judge Jones.  At present, with only six months remaining until March 2022, we also consider that it will be appropriate for Elizabeth to work on certain matters after the effective date of a confirmed plan in cases assigned to Judge Jones.  Her work will be limited to post-effective date matters that will not come before Judge Jones for decision.  This includes such matters as advising on plan mechanics and interpretation, or on post-efffective date asset sales outside of the bankruptcy court that were authorized under a plan.  None of these activities would come before Judge Jones for decision, nor would they result in fees to be recovered from the estate or presented to the court for approval.

2)      Adjust Elizabeth's 2021 distribution of net income to remove any portion of firm net profits derived from cases before Judge Jones.  As an equity partner at JW, Elizabeth has been

Mr. Peter Jarvis
August __, 2021
Page 5

_____

assigned a percentage share of firm profits for 2021.  Her share is __%, which would result in net income of $ _____ at budgeted firm net income of $ _____.  During the year, equity partners receive a monthly draw at 60% of their share of budgeted net income.  Additional distributions may be authorized around estimated tax dates, but at year end all equity partners will have received substantially less than their shares of budgeted net income.  Net income is budgeted very conservatively, actual net income regularly exceeds budgeted net income by a substantial margin, and is expected to do so in 2021 based on performance to date.  Once net income for the year has been determined, the balance is distributed to each equity partner in mid-January.  In Elizabeth's case, her final distribution will be calculated by multiplying her assigned percentage share times firm net income, but excluding the portion of firm net income derived from fees received for firm work on cases before Judge Jones.  For example, if fees from those cases accounts for 2% of total firm revenues in 2021, then Elizabeth's net income for 2021 would be calculated by multiplying her percentage share times 98% of firm net income, rather than 100%.

**Conclusion**

We will appreciate your careful review of this matter.  Please let us know whether you have questions or require additional information.  Please let us know whether, in your judgment, the measures we have described are appropriate and sufficient to address these circumstances, from the standpoint of avoiding disqualification of Judge Jones or Jackson Walker when we appear in cases before him and in terms of our own ongoing compliance with applicable ethical requirements.  We look forward to hearing from you.

Sincerely,

**DRAFT**

Patrick R Cowlishaw