IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 22-50009 |
| 4E BRANDS NORTHAMERICA, LLC,[1] | § | |
| | § | CHAPTER 11 |
| DEBTOR. | § | |

---

**UNITED STATES TRUSTEE'S REPLY TO JACKSON WALKER LLP'S RESPONSE IN OPPOSITION TO AMENDED AND SUPPLEMENTAL MOTION FOR (1) RELIEF FROM JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(B)(6) AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9024 APPROVING THE RETENTION AND COMPENSATION APPLICATIONS OF JACKSON WALKER LLP, (2) SANCTIONS, AND (3) RELATED RELIEF**

---

[Relates to ECF No. 692]

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is 4E Brands Northamerica LLC (0310). The Debtor's principal place of business is 17806 Interstate Highway 10, Suite 300, San Antonio, TX 78257. The Debtor's service address is: 41 W. Putnam Ave., STE 103, Greenwich, CT 06830.

I.      PRELIMINARY STATEMENT ........................................................................... 5

II.     LAW AND ARGUMENT ................................................................................... 9

A.      Judge Jones's Relationship with a Jackson Walker Partner Disqualified Both Judge
        Jones and Jackson Walker. ................................................................................... 9

        1.      Judge Jones's Relationship with Ms. Freeman Created at Least an
                Appearance of Partiality Requiring Recusal Under Section 455. .......................... 9

        2.      Judge Jones Did Not Have the Authority to Approve Jackson Walker's
                Employment and Compensation Requests under Rules 5002 and 5004 ................ 11

        3.      Jackson Walker's Partner's Relationship with Judge Jones Meant that
                Jackson Walker Was Not Disinterested. ................................................................. 13

B.      Jackson Walker's Arguments that It Had No Obligation to Disclose the
        Relationship Despite Its Obvious Relevance to Jackson Walker's Retention and
        Compensation Applications Fail. ....................................................................... 16

        1.      Jackson Walker Had a Duty to Disclose Its Partner's Romantic and
                Financial Relationship with the Presiding Judge Who Would, *Inter Alia*,
                Approve Its Compensation. ................................................................................... 16

        2.      Jackson Walker Does Not Dispute It Had an Obligation to Disclose the
                Relationship in Cases Where Judge Jones Was a Mediator. ................................. 19

C.      Even Without Discovery, the Facts to Date Show that Jackson Walker Violated Its
        Disclosure Obligations—and After March 2021, Its Nondisclosure Was Concededly
        Knowing and Intentional ..................................................................................... 20

        1.      Even Assuming Discovery Yields No New Facts, Jackson Walker Cannot
                Claim Lack of Knowledge Before February 2022 Because Ms. Freeman's
                Knowledge Is Imputed to It. ................................................................................. 20

                a.      Ms. Freeman's Knowledge Is Imputed to Jackson Walker Under
                        Texas Agency Law. ................................................................................... 20

                b.      Ms. Freeman's Actual Knowledge, While She Was an Equity
                        Partner, Is Imputed Under the Texas Revised Partnership Act. ............... 22

                c.      Jackson Walker Cites No Relevant Case Law Supporting Its Position
                        that the Knowledge of Its Partner Should Not Be Imputed to the
                        Firm ........................................................................................................... 23

        2.      Jackson Walker's Admitted Facts Show that by March 2021 It Knew that
                Ms. Freeman Had at Least a Past Relationship with Judge Jones, but It
                Made a Considered Decision Not to Disclose It. ................................................... 25

        3.      Jackson Walker's Admitted Facts Show that by February 2022 It Knew the
                Relationship Was Ongoing, but It Again Made a Considered Decision Not
                to Disclose It. ......................................................................................................... 27

D.      Jackson Walker's Arguments that It Is Not Bound by the Disciplinary Rules Fail. ......... 31

E.   The Court Should Vacate Its Prior Orders Approving Jackson Walker's Retention and Fee Applications. .......................................................................... 35

F.   The Court Should Order Disgorgement in the Full Amount of Fees Paid to Jackson Walker Due to the Firm's Egregious Misconduct. ............................ 40

   1.   Section 328(c) Authorizes the Court to Order Jackson Walker to Return the Compensation Received in These Cases. ................................... 41

   2.   An Order Requiring Jackson Walker to Return All Fees Is Within the Court's Broad Supervisory Powers Over Attorneys Retained by the Estate. ....... 44

   3.   This Court Has Inherent Authority to Order Jackson Walker to Return Compensation as a Sanction for Violating this Court's Rules. ............................ 45

   4.   Jackson Walker's Demand for Leniency Is Unconvincing. .................................. 46

G.   Jackson Walker's Attempts to Evade Any Consequence for Its Disclosure Violations Fail. ........................................................................... 51

   1.   The U.S. Trustee Has Standing to Seek Vacatur of the Retention and Compensation Orders, Disgorgement of Compensation, and Sanctions Against Jackson Walker. ....................................................................... 51

      a.   The U.S. Trustee Has Standing and Authority to Enforce Jackson Walker's Disclosure Requirements to Vindicate the Integrity of the Bankruptcy System. ............................................... 53

      b.   The U.S. Trustee's Motion Does Not Assert a "Claim" Nor Is the Right to Seek a Remedy for Jackson Walker's Disclosure Violations Exclusively Held by the Estate. ............................... 57

      c.   Jackson Walker Cannot Hide Behind Standing Arguments Because This Court Has Independent Authority to Sanction It for Its Nondisclosures. ............................................... 59

   2.   The Releases in the Confirmed Plan Do Not Bar the U.S. Trustee's Motions. .... 60

      a.   The U.S. Trustee Can Raise, and this Court Should Address, Jackson Walker's Misconduct Regardless of Whether the Estate Has Claims Against Jackson Walker. ............................... 60

      b.   The U.S. Trustee's Right to Hold Jackson Walker Accountable for its Misdeeds Is Carved Out from the Nondebtor Releases Under the Plan and Confirmation Order. ........................................ 61

      c.   The U.S. Trustee Is Not a "Releasing Party" Under the Plain Language of the Plan. ................................................. 62

      d.   The Releases Do Not Apply Because They Carve Out Acts or Omissions that Constitute Actual Fraud, Willful Misconduct, or Gross Negligence. ................................................ 62

      e.   The U.S. Trustee Does Not Seek to Modify the Plan or Confirmation Order. ..................................................... 67

   f.  Equitable Estoppel Precludes Jackson Walker's Defenses Due to Its Ongoing Failures to Disclose and Continuing Misrepresentations........... 70

   g.  Jackson Walker May Not Rely on the Exculpations and Releases Because It Has Unclean Hands. ................................................................. 71

III.  CONCLUSION............................................................................................................... 74

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

Kevin M. Epstein, the United States Trustee for Regions 6 and 7 ("U.S. Trustee"), files this reply to Jackson Walker LLP's ("Jackson Walker") *Response in Opposition to the United States Trustee's Amended and Supplemental Motion for (1) Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6) and Federal Rule of Bankruptcy Procedure 9024 Approving the Retention and Compensation Applications of Jackson Walker LLP, (2) Sanctions, and (3) Related Relief*, ECF No. 692 ("JW Opp.").[2]

## I.   PRELIMINARY STATEMENT

1.      Jackson Walker made a conscious decision to hide the fact that its partner had a financial and romantic relationship with the presiding judge who approved her firm's retention and compensation applications and before whom her firm appeared both in cases where he presided and that he mediated.  In so doing, the firm violated multiple duties under the Bankruptcy Code, the Bankruptcy Rules, and the Texas Disciplinary Rules of Conduct ("Disciplinary Rules"), and as officers of the court.

2.      Even taking Jackson Walker's untested allegations as true, Jackson Walker's ostrich defense fails because its partner's knowledge is imputed to it.  And even were that not the case, Jackson Walker has admitted that by March 2021 it knew that its partner had a past romantic relationship with Judge Jones, and that by March 2022, it knew that relationship was ongoing.

---

[2] The *United States Trustee's Amended and Supplemental Motion for (1) Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6) and Federal Rule of Bankruptcy Procedure 9024 Approving the Retention and Compensation Applications of Jackson Walker LLP, (2) Sanctions, and (3) Related Relief* filed in cases where Judge Jones presided shall be referred to herein as the "60(b) Mot."  Additionally, those motions that were filed in cases where Judge Jones served as mediator will be referred to herein as "60(b) Mot. – Med."  The 60(b) Mot. and 60(b) Mot. – Med. shall be referred to collectively as the "60(b) Motions" herein.

Jackson Walker also filed a *Preliminary Response of Jackson Walker LLP to Recent Filings by the Office of the United States Trustee*, which shall be referred to herein as the "Prelim. Resp."

3.     Jackson Walker claims that it took "reasonable" steps to address the impropriety of its partner's romantic and financial entanglement with the Judge.  But those alleged steps did not accomplish the most important thing Jackson Walker was required to do: disclose.  Instead, those steps merely show that Jackson Walker knew it had an ethical problem yet made the conscious decision to keep its partner's relationship with the Judge a secret.

4.     In its efforts to excuse these violations, Jackson Walker makes arguments that it had no obligation to disclose and, even if it did, it should not be punished for violating its disclosure obligations.  But it is well established in the Fifth Circuit, and nationwide, that bankruptcy professionals have an obligation to disclose any potential conflict of interest.  *See* 60(b) Mot., Part IV.B; 60(b) Mot. – Med., Arg. Part I.A–B; *infra* Part II.B–C.  As the Seventh Circuit held just last year, "[t]he Bankruptcy Code's disclosure requirements are 'central to the integrity of the bankruptcy process.'"  *Dordevic v. Layng (In re Dordevic),* 62 F.4th 340, 342–43 (7th Cir. 2023).  The default sanction for the violation of disclosure obligations is the denial of all fees, including disgorgement of fees already paid.  *See* 60(b) Mot., Part IV.G; 60(b) Mot. – Med., Arg. Part II; *infra* Part II.F.

5.     The Court should reject Jackson Walker's dismissive "no harm, no foul" approach to its misconduct.  The harm, in these cases and to the reputation of this Court and the integrity of the bankruptcy system more broadly, is immeasurable.  But harm is not a prerequisite to sanctioning attorney misconduct.

6.     Rather, full disclosure is the prerequisite to be retained or paid by the estate.  Even if Jackson Walker could somehow prove that no proceedings were influenced by the undisclosed relationship, and Jackson Walker provided reasonable and necessary services that benefitted the estate, none of that is relevant to whether Jackson Walker acted wrongfully.  Nor would it show

that the denial of fees—the remedy for nondisclosure routinely upheld by United States Courts of Appeals—should not be applied with equal force here.  A contrary holding would undercut the very underpinnings that mandate ethical disclosures in the first place.

7.     Jackson Walker lays blame for its current circumstances at the feet of everyone but Jackson Walker.  The U.S. Trustee's Rule 60(b) Motion does not "inequitably and improperly target[]" Jackson Walker.  JW Opp. at ¶ 1.  Nor does the "U.S. Trustee . . . concede[] that the inappropriate conduct at issue . . . was that of former Judge Jones."  JW Opp. at ¶ 3.

8.     To be sure, Judge Jones's conduct was highly improper.  But Jackson Walker's argument that it is not liable for Judge Jones's misconduct is a strawman.  It is Jackson Walker's misconduct in repeatedly failing to disclose the relationship between its partner and Judge Jones that merits the denial of all fees and sanctions.  Even after it admittedly knew that its partner had a past romantic relationship with the Judge, and even after it admittedly knew that the relationship was ongoing, it thought carefully about what to do and concluded that its interests were best served by keeping quiet.

9.     Jackson Walker also attempts to blame Ms. Freeman and Judge Jones because they proposed disclosures that Jackson Walker determined were "insufficient, inadequate, and misleading."  JW Opp. at ¶ 57.  Jackson Walker's determination, in the face of the inadequacy of these proposed disclosures, that the best course of action was to make no disclosure at all is indefensible.  Jackson Walker knowingly allowed the world to believe what it recognized was a lie—that Judge Jones and Ms. Freeman's relationship was no different than the relationship the Judge had with other lawyers.

10.     Jackson Walker asserts that, even if it engaged in sanctionable conduct, it cannot be held to account for its actions.  It argues that the U.S. Trustee lacks standing to ask this Court to

address Jackson Walker's wrongdoing and enter appropriate relief.  Jackson Walker cites not a single decision involving a U.S. Trustee that holds this.  And Jackson Walker's standing argument is atextual.  The plain language of section 307 of title 11 empowers United States Trustees to "raise" "any issue," and section 586 specifically authorizes the U.S. Trustee to police professional retention and compensation.

11.    In any event, this Court has an independent power and duty to address this type of wrongdoing, deny fees, and impose sanctions.  *See infra* Part II.F.

12.    Jackson Walker also alleges that it is insulated from liability by releases and exculpations in a plan that it drafted.  However, those releases are both inapplicable and unenforceable, and there are no exculpations in this case.

13.    Jackson Walker cannot escape public scrutiny of, and accountability for, its misconduct that has undermined public and stakeholder confidence in the integrity of the bankruptcy system generally and this Court specifically.  Instead, the court should vacate the retention and employment orders in these cases and require disgorgement of all fees Jackson Walker received.  Although Jackson Walker states that denying the U.S. Trustee's 60(b) Motion would not condone Jackson Walker's conduct, it would do exactly that and send the message that professionals can violate their ethical, disclosure, and fiduciary duties without consequence and keep their ill-gotten gains.  The opposite has been the law across circuits and across decades.

## II.   LAW AND ARGUMENT

**A.   Judge Jones's Relationship with a Jackson Walker Partner Disqualified Both Judge Jones and Jackson Walker.**

**1.   Judge Jones's Relationship with Ms. Freeman Created at Least an Appearance of Partiality Requiring Recusal Under Section 455.**

14.   In its 60(b) Motion, the U.S. Trustee established that Judge Jones should have been disqualified under 28 U.S.C. § 455(a)–(b).  *See* 60(b) Mot., Part IV.A.1–2; 60(b) Mot.– Med., Arg. Part I.A.1.

15.   Jackson Walker does not contest that Judge Jones's relationship with Ms. Freeman created an appearance of impropriety under section 455(a).  Indeed, Jackson Walker, by its counsel, Ms. Brevorka, has made this admission in a separate pending civil proceeding:

> THE COURT: But, counsel, this all goes back to the very beginning in that Judge Jones shouldn't have been presiding over these matters. Period.
> MS. BREVORKA: Correct.
> THE COURT: So it creates the appearance of impropriety at a minimum.
> MS. BREVORKA: Correct.

Exhibit 1 - *Van Deelen v. Jones*, No. 4:23-CV-3729, Hr'g Tr. at 80:4–10 (S.D. Tex. June 6, 2024). Rather, Jackson Walker contends that the U.S. Trustee lacks "specific facts" to evaluate Judge Jones' decision to not recuse and that the U.S. Trustee would have to explain the nature of the relationship at "*each* relevant time in *each* challenged case."  JW Opp. at ¶ 149, n.178.  Jackson Walker fails to explain what additional facts are needed.  For every case at issue, Judge Jones had at least a past romantic relationship with Ms. Freeman, he co-owned a house with her where they lived together, and she was the executor of, and beneficiary under, his will.  Judge Jones's partiality, at the least, "might reasonably be questioned" based on these admitted facts that existed throughout Ms. Freeman's tenure at Jackson Walker.  And that is sufficient to mandate recusal.  28 U.S.C. § 455(a) (dictating that a judge "*shall* disqualify himself in any proceeding in which his impartiality

might reasonably be questioned") (emphasis added).  To the extent more detail is needed, discovery is likely to more fully establish the contours of the relationship between Ms. Freeman and Judge Jones and show that section 455(a) disqualified Judge Jones from presiding at all relevant times.

16.     Jackson Walker also argues that section 455(b)(5) does not apply to Judge Jones because Ms. Freeman was not married to him.  *See* JW Opp. at ¶¶ 163–65.  But as established in the U.S. Trustee's 60(b) Motion and recognized by the Chief Judge of the Fifth Circuit in her complaint against Judge Jones, "[r]ecusal considerations applicable to a judge's spouse should also be considered with respect to a person other than a spouse with whom the judge maintains both a household and an intimate relationship."  Ethics Complaint at 3–4 (quoting Commentary to Canon 3C of the Code of Conduct for United States Judges).

17.     Jackson Walker ignores the Fifth Circuit's Ethics Complaint and argues that the Commentary to the Code of Judicial Ethics should likewise be ignored.  But, as demonstrated by the Ethics Complaint's reliance on it, while the commentary may not be binding on this Court, it is instructive.  Section 455 was enacted with the purpose of "reconcil[ing] the 1972 Code of Judicial Conduct with the federal statutes.  Its purpose was to eliminate 'dual standards, statutory and ethical, couched in uncertain language (that) had the effect of forcing a judge to decide either the legal or the ethical issue at his peril.'"  *See SCA Servs., Inc. v. Morgan*, 557 F.2d 110, 113 (7th Cir. 1977) (quoting H.R. Rep. No. 93-1453, 93d Cong., 1st Sess. 2 (1973).  When considering whether Judge Jones was disqualified, this Court can "properly consider as an aid to the exercise of his informed discretion any and all codes of judicial conduct, including Canon 3 of the American Bar and any advisory directives of the Judicial Conference of the United States."  *Va. Elec. & Power Co. v. Sun Shipbuilding & Dry Dock Co. (In re Va. Elec. & Power Co.)*, 539 F.2d 357, 369 (4th Cir. 1976).

18.     Ms. Freeman has been in a relationship with Judge Jones that is akin to a spousal relationship, which is closer and more intimate than relationships that are defined as a relationship within the third degree (such as great-grandparents, nephews, and nieces), which also require recusal.  Ms. Freeman and Judge Jones were in a romantic relationship, they shared a home, and Ms. Freeman was the executor of Judge Jones' will, as well as a beneficiary.  *See* Exhibit 2 - Elizabeth Freeman's Responses to United States Trustee's First Set of Interrogatories*, In re IEH Auto Parts Holding, Inc.*, No. 23-90054, Resp. 3.  While they were not legally married, the nature of their relationship brings them within the ambit of section 455(b), mandating recusal.

**2.     Judge Jones Did Not Have the Authority to Approve Jackson Walker's Employment and Compensation Requests under Rules 5002 and 5004.**

19.     Rules 5002 and 5004 were promulgated to promote fairness in our judicial system. As established in the U.S. Trustee's 60(b) Motion, Rules 5002 and 5004 preclude Judge Jones from approving Jackson Walker's employment and compensation.  *See* 60(b) Mot., Part IV.A.3–4.

20.     Jackson Walker contends that Rule 5002(a) should not apply because Ms. Freeman is not a "relative" of Judge Jones.  *See* JW Opp. at ¶¶ 167–69.   But as established in the U.S. Trustee's 60(b) Motion, and as discussed above, because Ms. Freeman was equivalent to Judge Jone's spouse, she likewise is a relative by affinity.  *See* 60(b) Mot., Part. IV. A.3; 60(b) Mot. – Med., Part Arg. I.B.1.

21.     Any reading of Bankruptcy Rule 5002 that did not include cohabitating romantic partners because they lack a marriage certificate should be rejected as "demonstrably at odds with the intention of its drafters."  *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, (1989) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).  To fail to include such relationships would allow for a large swath of modern romantic relationships to go undisclosed under Rule 5002(a)(2), which cuts against the principles of promoting the integrity of the judiciary

contemplated by the Bankruptcy Code and Rules. *See generally* Exhibit 3 - Benjamin Gurentz, *Cohabiting Partners Older, More Racially Diverse, More Educated, Higher Earners*, Census.gov (Sept. 23, 2019), https://www.census.gov/library/stories/2019/09/unmarried-partners-more-diverse-than-20-years-ago.html ("The number of unmarried partners living together in the United States nearly tripled in two decades from 6 million to 17 million").

22.     Even if Ms. Freeman were not considered a relative, Jackson Walker, through Ms. Freeman, was so connected to Judge Jones "as to render it improper" for Judge Jones to have approved Jackson Walker's retention and compensation applications. *See* Fed R. Bankr. P. 5002(b). *See Judges' Social or Close Personal Relationships with Lawyers or Parties as Grounds for Disqualification or Disclosure*, ABA Comm. on Ethics & Pro. Resp., Formal Op. 488 (Sept. 5, 2019) (including, among relationships that should be disclosed, a judge and lawyer who are "divorced but remain amicable").

23.     Jackson Walker tries to distinguish Ms. Freeman's connection to Judge Jones as separate from its own. *See* JW Opp. at ¶ 170. That is, Jackson Walker attempts to cleave the conduct of its individual partners from the conduct of "the firm." Taken to its logical conclusion, this argument would mean that the firm could be retained in a case even if all its individual partners were "so connected [to the judge] as to render it improper." Fed. R. Bankr. P. 5002(b), 5004(b). That conclusion not only is nonsensical, it also contradicts established law and practice. As shown in the U.S. Trustee's 60(b) Motion, a partner's conflict of interest should be imputed to Jackson Walker.[3] *See* 60(b) Mot. at ¶¶ 111–13; 60(b) Mot. – Med. at ¶¶ 125–26; *see also* Disciplinary Rule 1.06(f). Even Jackson Walker understood this because it acknowledged that its attorneys'

---

[3] Jackson Walker's reliance on *Cygnus* is misplaced as that case did not interpret Bankruptcy Rules 5002 or 5004. Nor did *Cygnus* address facts like those here, where the firm's partner was in an intimate relationship with the judge without even an ethical wall between the partner and others in the firm working on the engagements.

connections are the firm's connections when it sought retention. *See, e.g.*, *In re Basic Energy Services, Inc.*, No. 21-90002, ECF No. 809, Jackson Walker Retention Appl. (disclosing that "to the best of the Debtors' knowledge, *these attorneys* have no interest adverse to the Debtors, or to the Debtors' bankruptcy estates, and *are disinterested*.") (emphasis added).

24.     In any event, Jackson Walker ignores its own connection to Judge Jones by virtue of Ms. Freeman's relationship with him:  Jackson Walker had a material financial interest in having a friendly judge in a relationship with its partner who might lend a less critical eye to its employment and compensation requests.  This "render[ed] it improper" for Judge Jones to have approved Jackson Walker's retention and compensation applications.  *See* Fed R. Bankr. P. 5002(b), 5004(b).

### 3.     Jackson Walker's Partner's Relationship with Judge Jones Meant that Jackson Walker Was Not Disinterested.

25.     As established in the U.S. Trustee's 60(b) Motion, Ms. Freeman's relationship with Judge Jones—whether the romantic relationship was over or still ongoing—rendered Jackson Walker not disinterested.  60(b) Mot., Part IV.E; 60(b) Mot., Arg. Part I.B.1.

26.     Jackson Walker erroneously argues that the U.S. Trustee's motion is built on a "reimagined framework" for the retention and compensation of professionals at odds with the Bankruptcy Code.  JW Opp. at ¶ 100.  Section 327 expressly prohibits the estate from retaining professionals unless they "do not hold or represent an interest adverse to the estate, and . . . are disinterested persons."  11 U.S.C. § 327.  And section 328(c) provides that the court may deny compensation to a professional "if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."  *Id*. § 328(c).

27.     Thus, estate-retained professionals must be free of adverse interests and must be disinterested to be eligible for retention and compensation, and the burden is on the applicant to establish each.  11 U.S.C. §§ 327, 328.  *See, e.g., Waldron v. Adams & Reese, L.L.P. (In re Am. Int'l Refinery, Inc.)*, 676 F.3d 455, 461 (5th Cir. 2012); *I.G. Petroleum, L.L.C. v. Fenasci (In re West Delta Oil Co.)*, 432 F.3d 347, 355 (5th Cir. 2005); *Pierson & Gaylen v. Creel & Atwood (In re Consol. Bancshares, Inc.)*, 785 F.2d 1249, 1256 n. 6 (5th Cir. 1986); *In re B.E.S. Concrete Prods., Inc.,* 93 B.R. 228, 237 (Bankr. E.D. Cal. 1988); *In re Huddleston*, 120 B.R. 399, 400–01 (Bankr. E.D. Tex. 1990).

28.     The Fifth Circuit has "observed that these standards [for retention] are 'strict' and that attorneys engaged in the conduct of a bankruptcy case 'should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration.'"  *West Delta Oil*, 432 F.3d at 355 (quoting *Consol. Bancshares*, 785 F.2d 1249).

29.     Jackson Walker had an obvious interest in having a favorable judge approve its fee applications, but Jackson Walker's interest in higher fees is contrary to the estate's interest in lower fees.   While ordinarily the requirement that the bankruptcy court approve professionals' compensation serves to protect the estate from that inherent conflict, Jackson Walker's interest in having a favorable judge reviewing its fee applications made it adverse to the estate's interest.  And disclosure was contrary to Jackson Walker's interests because it could not only lead to a less favorable judge, but could lead parties to challenge Jackson Walker's fees, as has happened.  As the Tenth Circuit explained in *Stewart*: "If, for example, [the attorney] had thought that disclosure would lead to substantial challenges to the payments (as indeed occurred), [the attorney] would

14

have had a motive not to disclose." *SE Property Holdings, LLC v. Stewart (In re Stewart)*, 970 F.3d 1255, 1268 (10th Cir. 2020).  Jackson Walker also had an interest in not disclosing the relationship because disclosure could jeopardize its ability to attract clients if it was precluded from appearing before half of the bankruptcy judges in the Southern District of Texas assigned to hear complex cases—particularly given that it was generally being hired as local, not lead, counsel. *See* Exhibit 1 - *Van Deelen v. Jones*, No. 4:23-CV-3729, Hr'g Tr. at 100:14, 101:24–25 (S.D. Tex. June 6, 2024) (explaining that Kirkland & Ellis worked with Jackson Walker as local counsel due to Jackson Walker's "longer and historic ties" as the "largest firm in Texas with a much longer history there [than Kirkland]").  These are actual conflicts of interest with the estate, not merely hypothetical, theoretical, or speculative conflicts as asserted by Jackson Walker.[4]  JW Opp. at ¶ 113.

30.     Jackson Walker posits that it had no adverse interest because, if it had disclosed the relationship, Judge Jones could have recused and Jackson Walker would then not be disqualified and would not have an adverse interest to it "***clients***."  JW Opp. at ¶ 111 (emphasis in original).  But the adverse interest inquiry focuses not on Jackson Walker's clients, but the *estate.* 11 U.S.C. § 327.  More fundamentally, Jackson Walker's counterfactual ignores the elephant in the room:  no one knew to seek Judge Jones's recusal or Jackson Walker's disqualification, or to challenge its fees, because Jackson Walker did not disclose the relationship.

---

[4] Jackson Walker's reliance on *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 477 (3d Cir. 1998), is thus inapposite.  JW Opp. ¶¶ 112–13.

**B.     Jackson Walker's Arguments that It Had No Obligation to Disclose the Relationship Despite Its Obvious Relevance to Jackson Walker's Retention and Compensation Applications Fail.**

**1.     Jackson Walker Had a Duty to Disclose Its Partner's Romantic and Financial Relationship with the Presiding Judge Who Would, *Inter Alia*, Approve Its Compensation.**

31.     Even if Jackson Walker did not have an actual conflict of interest, it still had an obligation to disclose the relationship (whether it was past or ongoing) to enable the parties and the Court to judge this issue for themselves.  "[T]he Code and associated Rules impose a rigorous structure of oversight on a debtor, its professionals, and the estate.  At the heart of that structure is a baseline presumption – and an expectation – of disclosure and candor."  *In re 38-36 Greenville Ave. LLC*, No. 21-2164, 2022 WL 1153123, at *5 (3d Cir. Apr. 19, 2022).

32.     Jackson Walker does not dispute, as established in the U.S. Trustee's 60(b) Motion, that bankruptcy professionals' disclosure obligations are broader than section 327's prohibitions because it is for the court, not the professionals, to decide if a disqualifying conflict exists.  *See* 60(b) Mot., Part IV.B; 60(b) Mot. – Med., Arg. Part II.B.1.

33.     Rather, Jackson Walker narrowly focuses on Rule 2014.  Because of Rule 2014's singular purpose —to ensure estate-paid professionals satisfy the retention standards of section 327 (or section 1103), it cannot limit or alter the statutory retention requirements.  Bankruptcy Rule 2014 is merely one tool to "facilitate[] the implementation of § 327 and § 101(14) of the Bankruptcy Code."  *In re Alpha Nat. Res., Inc.,* 556 B.R. 249, 258 (Bankr. E.D. Va. 2016).  To use a Rule intended to force counsel to disclose potential conflicts of interest as justification for hiding them would turn the law on its head.

34.     Indeed, as established in the U.S. Trustee's Motion, *see* 60(b) Mot., Part IVB; 60(b) Mot. – Med., Arg. Part I.B.3., Rule 2014 is not the limit, nor the only source, of the disclosure obligations of professionals who will seek to be paid at the estate's expense.  A debtor's counsel's

duty to disclose "arises not solely by reason of the bankruptcy rules, but also is founded upon the fiduciary obligation owed by counsel for the debtor to the bankruptcy court." *Futuronics Corp. v. Arutt, Nachamie, & Benjamin (In re Futuronics Corp.)*, 655 F.2d 463, 470 (2d Cir. 1981) (quotation marks omitted); *see also In re EWC, Inc*., 138 B.R. 276, 279 (Bankr. W.D. Okla. 1992); *Rome v. Braunstein*, 19 F.3d 54, 62 (1st Cir. 1994).  This obligation includes the duty "to disclose any actual or potential conflicts of interest with the estate."  *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 850 (B.A.P. 10th Cir. 1997); *accord In re Food Mgmt. Grp., LLC*, 380 B.R. 677, 711 (Bankr. S.D.N.Y. 2008).

35.     Jackson Walker does not address this law other than to dismiss the notion that it has a fiduciary duty to the Court as *dicta*.  JW Opp. at 44 n.99.  That characterization is wrong.  In *Futuronics*, for example, the Second Circuit found that counsel had violated Rule 215—the rule promulgated incident to the Code's enactment more than 45 years ago requiring the disclosure of connections—but *also* found that two law firms "flagrantly breached their fiduciary obligations to the bankruptcy court" based on their failure to disclose, when one firm sought interim compensation, that the requesting firm had transferred one-third of the advances already received to the other firm.  *Futuronics Corp.*, 655 F.2d at 471.  Moreover, even if Jackson Walker is dismissive of its obligations to the Court, it cannot deny that it owes a fiduciary duty to the estate and its creditors, *see* 60(b) Mot., Part IV.D, who are also entitled to fulsome disclosures by the professionals who will be paid ahead of them.

36.     Jackson Walker further argues that, despite the "sweeping language" in these opinions, "no court has looked beyond the Bankruptcy Code's or Rule's text to impose additional obligations on professionals under the relevant provisions."  JW Opp. at ¶ 44 n.99.  But the court need not look beyond the Bankruptcy Code—the disclosure obligation is firmly grounded in the

disinterested requirements of sections 327(a) and 328(c), as well as the bankruptcy courts' authority to implement those provisions in section 105(a) and in attorneys' duties as officers of the court.

37.    As explained by the First Circuit, "sections 327(a) and 328(c) cannot achieve their purpose unless court-appointed counsel police themselves in the first instance." *Rome*, 19 F.3d at 59. *See also Consol. Bancshares*, 785 F.2d at 1255 ("Vigilance is required by and among court-appointed counsel in particular to enforce the standards of the Code."). "[B]ecause the bankruptcy court does not possess the resources to independently investigate an applicant's conflicts of interest, full and candid disclosure is required to enable the court to determine whether the applicant meets the 'disinterested' standards of § 327(a)." *In re Benjamin's-Arnolds, Inc.*, No. 4-90-6127, 1997 WL 86463, at *9 (Bankr. D. Minn. Feb. 28, 1997).

38.    To the extent Jackson Walker suggests that courts do not enforce disclosure obligations beyond the literal terms of Rule 2014, that is not true.  In the *Leslie Fay* case, for example, the court found that counsel was obligated to disclose its policy of never suing accounting firms—which is not a "connection" listed in Rule 2014. *In re Leslie Fay Cos., Inc*., 175 B.R. 525, 535 (Bankr. S.D.N.Y. 1994).

39.    Indeed, courts have never limited professionals' disclosure obligations to the literal terms of Rule 2014—and Jackson Walker cites no case holding that the disclosure obligation is so limited.  The Rule, for example, does not expressly require continuing disclosure, but the obligation to update disclosures with new information is well established.  As the Fifth Circuit explained, "[a]lthough [Rule 2014(a)] does not explicitly require ongoing disclosure, case law has uniformly held that under Rule 2014(a), (1) full disclosure is a continuing responsibility, and (2) an

attorney is under a duty to promptly notify the court if *any* potential for conflict arises." *West Delta Oil*, 432 F.3d at 355 (internal quotation marks omitted; emphasis added).

40.     Jackson Walker's position, that it had no obligation to disclose Ms. Freeman's relationship with Judge Jones at any time, even when it admittedly knew about the relationship, JW Opp. at ¶¶ 108–09, is astonishing.  Jackson Walker cites no case blessing such nondisclosure. It is directly contrary to the view of the Advisory Committee to the Bankruptcy Rules, which has expressly stated that "appropriate disclosure must be made to the bankruptcy court" of any connections to a judge "before accepting appointment or employment."  Fed. R. Bankr. P. 5002, advisory comm. n. to 1985 Amendment (emphasis added).  And it is directly contrary to Fifth Circuit's holdings and other precedent establishing bankruptcy professionals' duties to the court, including the duty to update the court if *any* potential conflict arises.  *See, e.g., West Delta Oil*, 432 F.3d at 355.

### 2.     Jackson Walker Does Not Dispute It Had an Obligation to Disclose the Relationship in Cases Where Judge Jones Was a Mediator.

41.     Jackson Walker does not dispute that, as established in the U.S. Trustee's 60(b) Motion, it had an obligation to disclose Ms. Freeman's relationship to Judge Jones in cases that he mediated under Local Rule 16.4.I(2).   60(b) Mot. – Med., Arg. Part I.A.2.   The Local Rule expressly requires potential mediator conflicts to be raised with the Court.  S.D. Tex. L.R. 16.4.I(2). And as established in the U.S. Trustee's Motion, under 28 U.S.C. § 455, which also applies to mediators under the Local Rules, Judge Jones had at least a potential conflict because of his relationship with Ms. Freeman.  60(b) Mot. – Med., Arg. Part I.A.

42.     Although Jackson Walker denies that it knew the relationship was ongoing before 2022, as explained in the U.S. Trustee's Motion, 60(b) Mot., Part IV.B, and below, *infra* at Part II.C.1, Ms. Freeman's knowledge is imputed to it.  And that denial is relevant to only three of the

mediated cases.   In four of the seven mediated cases (*HONX*, *Altera*, *GWG*, and *IEH*), the mediations occurred after Jackson Walker concededly had knowledge of Ms. Freeman's ongoing relationship with Judge Jones, and in two of them (*HONX* and *GWG*), no final fee order has yet been entered.

**C.** **Even Without Discovery, the Facts to Date Show that Jackson Walker Violated Its Disclosure Obligations—and After March 2021, Its Nondisclosure Was Concededly Knowing and Intentional.**

**1.** **Even Assuming Discovery Yields No New Facts, Jackson Walker Cannot Claim Lack of Knowledge Before February 2022 Because Ms. Freeman's Knowledge Is Imputed to It.**

43.     Jackson Walker's self-serving assertions that not a single Jackson Walker attorney other than Ms. Freeman knew of her past relationship with Judge Jones before March 2021 and her continuing relationship with him before March 2022 remains wholly untested and highly implausible.   However, even if true, Jackson Walker still knew of the relationship because Ms. Freeman knew.   Jackson Walker's position that Ms. Freeman's knowledge cannot be imputed to the firm from the moment she joined the firm is at odds with the governing Texas statutes and common law.   *See* JW Opp. at ¶¶ 119–29.

**a.** **Ms. Freeman's Knowledge Is Imputed to Jackson Walker Under Texas Agency Law.**

44.     As both an equity and income partner at Jackson Walker, Ms. Freeman's knowledge was imputed to the firm because she was an agent of the firm.   "Under Texas law, an agent is someone authorized by a person or entity to transact business or manage some affair for that person or entity." *Elbar Inv., Inc. v. Okedokun* (*In re Okedokun*), 593 B.R. 469, 533 (Bankr. S.D. Tex. 2018) (quoting *Tex. Soil Recycling, Inc. v. Intercargo Ins. Co.*, 273 F.3d 644, 650 (5th Cir. 2001)). "It is a basic tenet of the law of agency that the knowledge of an agent, or for that matter a partner or joint venturer is imputed to the principal." *In re Anderson*, 330 B.R. 180, 187 (Bankr. S.D. Tex.

2005) (quoting *Thomas v. N.A. Chase Manhattan Bank*, 1 F.3d 320, 325 (5th Cir. 1993)); *see also Okedokun*, 593 B.R. at 535 ("[A] principal is deemed to know facts that are known to its agent.") (quoting *Sec. Inv. Prot. Corp. v. Cheshier & Fuller, L.L.P. (In re Sunpoint Secs., Inc.)*, 377 B.R. 513, 562 (Bankr. E.D. Tex. 2007)).[5]

45.     The Texas Revised Partnership Act ("Partnership Act") recognizes that agency law is also applicable to limited liability partnerships.  *See* Tex. Bus. Orgs. Code § 152.003 ("The principles of law and equity and the other partnership provisions supplement this chapter unless otherwise provided by this chapter or the other partnership provisions.").  And the statute incorporates agency law, stating that a partner is presumed to be an agent of the partnership.  Tex. Bus. Orgs. Code § 152.301 ("Each partner is an agent of the partnership for the purpose of its business.").

46.     Throughout her time at Jackson Walker, the firm presented Ms. Freeman as a partner, meaning she was, at the very least, an experienced, senior attorney with supervisory authority.  *See* JW Opp. at ¶¶ 30–31 (describing Ms. Freeman as an attorney that "excel[ed] in the bankruptcy field and a "mentor" who commonly provided "guidance" to "younger and mid-level attorneys").  She appeared as a partner of the firm in public and before the Court, and she transacted business on behalf of the firm, as its authorized agent, including filing fee applications.  *See, e.g., In re Exco Servs., Inc.*, No. 18-30167, ECF No. 41, Jackson Walker, Final Fee Appl. (Bankr. S.D. Tex. Aug. 27, 2019); s*ee also*, *e.g., In re Exco Res., Inc.*, No. 18-30155, ECF No. 1069, Jackson Walker Second Interim Fee Appl., Ex. B, (Bankr. S.D. Tex. Sept. 18, 2018) (listing Ms. Freeman

---

[5] Like the "adverse interest" exception in the Partnership Act, "[i]f the agent is acting adversely to the corporation, the corporation may not be bound by the agent's activity or knowledge." *Okedokun*, 593 B.R. at 535.  However, this exception does not apply here since Ms. Freeman's actions were in furtherance of Jackson Walker's interests, allowing them to be retained in cases and benefit financially from those representations.

as a partner under the "Summary of Timekeepers Included in This Fee Application" table). As a result, it did not matter whether Ms. Freeman was an equity partner or an income partner; she was an agent of the firm, whose knowledge was imputed to the firm, in either case.

> **b.** **Ms. Freeman's Actual Knowledge, While She Was an Equity Partner, Is Imputed Under the Texas Revised Partnership Act.**

47.     The Partnership Act, which governs Jackson Walker's partnership, imputes a partner's knowledge to the partnership. "Receipt of notice by a general partner of a fact relating to the partnership is effective immediately as notice to the partnership unless fraud against the partnership is committed by or with the consent of the partner receiving the notice." Tex. Bus. Orgs. Code § 151.003(d). While there is an "adverse interest exception" to imputation, "'the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes'" for the exception to apply. *Okedokun*, 593 B.R. at 535 (quoting *Sunpoint Sec.*, 377 B.R. at 564), aff'd and remanded sub nom. *Elbar Invs., Inc. v. Prins (In re Okedokun)*, 968 F.3d 378 (5th Cir. 2020).

48.     Here, Ms. Freeman, as an equity partner since January 1, 2021, JW Opp. at ¶ 32, had actual knowledge of her relationship with former Judge Jones, and her actions were not a "total abandonment" of Jackson Walker's interests. Ms. Freeman's alleged failure to disclose her relationship to anyone at Jackson Walker financially benefitted both her and Jackson Walker across dozens of cases and, in this one, allowed both to profit from the retention orders and fee orders awarding compensation.

49.     Jackson Walker contends that imputation would "undermine the benefits of limited liability and much of the Texas Revised Partnership Act." *See* JW Opp. at ¶ 119 n.134. This wrongly interprets whose liability is limited under the principles of limited liability partnerships. A limited liability partnership limits the liabilities of *individual partners* from the actions of the

partnership.  *See* Tex. Bus. Orgs. Code § 152.801.  It does not protect the *partnership* from the actions of its partners when conducting partnership business.  Just the opposite: the Partnership Act makes the partnership liable for its partner's acts in the ordinary conduct of the business.  *See* Tex. Bus. Orgs. Code § 152.303(a)(1) ("A partnership is liable for loss or injury to a person, including a partner, or for a penalty caused by or incurred as a result of a wrongful act or omission or other actionable conduct of a partner acting . . . in the ordinary course of business of the partnership . . . .").

> ### c.   Jackson Walker Cites No Relevant Case Law Supporting Its Position that the Knowledge of Its Partner Should Not Be Imputed to the Firm.

50.    Under Jackson Walker's interpretation, it is difficult to know when, if ever, a law firm would have actual knowledge of anything.  A law firm can only know what its partners and agents know; it does not have its own independent mind.  In determining whether knowledge should be imputed, the court should look to governing state law.  *See*, *e.g.*, *Schmidt v. Nordlicht (In re Black Elk Energy Offshore Operations, LLC)*, 649 B.R. 249 (Bankr. S.D. Tex. 2023) (applying state law to hold that the knowledge of an agent should be imputed to defendants).

51.    The one case that Jackson Walker relies on for not imputing knowledge does not even discuss it.  *See* JW Opp. at ¶ 120.  In *Cygnus Oil & Gas Corp.*, the court rejects per se firm-wide disqualification, but states that it is "proper and required" for a court to consider whether an individual attorney's disinterestedness "would impair [other firm member's] ability to act on behalf of the debtor and the estate in an impartial manner."  No. 07-32417, 2007 WL 1580111, at *3 (Bankr. S.D. Tex. May 29, 2007).  There was no discussion of imputing a partner's knowledge to the firm.  In fact, the firm "fully disclosed McBride's interest in Cygnus in its affidavit supporting the application to employ," and the firm also disclosed that the partner was "walled off" from the

"reorganization team." *Id.* Thus, *Cygnus Oil & Gas Corp.* has no bearing on whether imputation of knowledge is appropriate under these circumstances.

52.     Jackson Walker argues that the cases the U.S. Trustee cited are inapposite because the knowledge in those cases was confidential information acquired during a previous client representation. *See* JW Opp. at ¶¶ 121–26. But this narrow reading of what knowledge can be imputed, ignores the governing law, as well as principles underlying why knowledge is imputed within a law firm. The "integrity of the legal practice" is protected by both maintaining information imputed to the firm (like client confidences) and properly disclosing information affecting firm business (like disqualifying conflicts of interest). *See Nat'l Med. Enter., Inc. v. Godbey*, 924 S.W.2d 123, 131–32 (Tex. 1996). As a result, imputation of knowledge deters firms from allowing its partners and attorneys from acting in a way that would undermine the fairness of the system, while also making the firm responsible for the actions of its agents.

53.     Jackson Walker also attempts to distinguish the *Bradley* case by differentiating actions of attorneys in their "private life" from actions performed in the "course of their employment." *See* JW Opp. at ¶ 128. This is a meaningless distinction because Ms. Freeman's private relationship was relevant to her work.[6] It is not uncommon for attorneys to disclose personal or financial relationships, independent of their position in the firm, when it is relevant to the case at hand. *See, e.g., In re Neiman Marcus Grp. Ltd. LLC*, No. 20-32519, ECF No. 748, Kirkland & Ellis LLP Retention Appl., Ex. A at ¶¶ 61–72 (Bankr. S.D. Tex. June 3, 2020) (disclosures including: (i) statement regarding de minimis attorney investments in parties in

---

[6] Notably, the Disciplinary Rules also recognize that a "personal" relationship is imputed to other attorneys at a firm, preventing others at the firm from acting where the individual attorney had a conflict of interest. *See* Disciplinary Rule 1.06(f) ("If a lawyer would be prohibited by this Rule from engaging in particular conduct, no other lawyer while a member or associated with that lawyer's firm may engage in that conduct.").

interest, (ii) a list of attorneys who formerly clerked for Southern District of Texas judges or worked for other parties in interest; and (iii) disclosure of an attorney whose spouse worked for a major bondholder in the case).  *See also In re Matco Elecs. Grp., Inc.*, 383 B.R. 848, 856 (Bankr. N.D.N.Y. 2008) (disallowing committee counsel's fees where the firm only vaguely disclosed that a partner was "related to" an officer of a general unsecured creditor when the attorney was actually the son-in-law of the CEO of an active member of the committee and the husband of the general counsel).   Indeed, Jackson Walker's conduct shows that it understood that these personal relationships matter for disclosure purposes.  *See infra* Part II.C.2–3 (discussing Jackson Walker's awareness of the issue).  Thus, just as in *Bradley*, the court may impose sanctions against Jackson Walker for Ms. Freeman's conduct in the course of her employment.

54.     Lastly, Jackson Walker criticizes the lack of cases cited that involve imputation of knowledge in the context of disclosures.  But that just indicates the rarity of this situation.  The events leading to this litigation are unprecedented, and it is not surprising that few, if any, analogous situations exist.  However, that does not give Jackson Walker a free pass.  The Court should apply governing statutes and common law and impute Ms. Freeman's knowledge and misconduct to her law firm.

### 2. Jackson Walker's Admitted Facts Show that by March 2021 It Knew that Ms. Freeman Had at Least a Past Relationship with Judge Jones, but It Made a Considered Decision Not to Disclose It.

55.     In  March  2021,  Jackson  Walker  admittedly  learned  two  critical  pieces  of information: (i) Ms. Freeman had (at least) a past romantic relationship with Judge Jones; and (ii) this revelation "contradicted" Ms. Freeman's disclosures to the firm when she was hired.  As an initial matter, despite contending that the March 2021 disclosure "contradicted the disclosures [Ms. Freeman] made to Jackson Walker when she joined the firm," JW Opp. at ¶¶ 35, 183, Jackson

Walker has not indicated that it did anything to verify Ms. Freeman's new denials of an ongoing relationship with Judge Jones.

56.     The steps it did take in response to the disclosure were woefully insufficient. Jackson Walker claims that after the March 2021 revelation it hired ethics counsel, JW Prelim. Resp. ¶ 14, but did not disclose the relationship when it sought retention in *Seadrill Limited*, or filed fee applications in two other cases, *J.C. Penney* and *Chesapeake Energy*, later that same month.  *See* JW Opp., Ex. 2 at 15, 19, 35.  Nor did it disclose the relationship in *Covia Holdings*, where it had a fee application pending.  *Id*. at 21.  And Jackson Walker continued to remain silent in five other cases where it filed retention or fee applications between March 2021 and March 2022.  *See id*. at 31 (*Gulfport Energy*, June 2021 fee application); *id*. at 37 (*Katerra*, June 2021 retention application); *id*. at 33 (*Seadrill Partners*, July 2021 fee application) *id*. at 29 (*Bouchard Trans.,* Oct. 2021 fee application); *id*. at 39 (*Seadrill New Finance Ltd.*, Feb. 2022 retention application).

57.     Jackson Walker also claims that it instructed Ms. Freeman not to work on matters assigned to Judge Jones and deducted from Ms. Freeman's "compensation any share of the firm's net income generated for bankruptcy work performed on behalf of clients in matters that were pending before former Judge Jones in light of this past relationship."  JW Opp. at ¶ 37.  Despite Jackson Walker's claimed prohibition on Ms. Freeman working on cases where Judge Jones presided, it appears that she did so.  Jackson Walker attorneys billed for interactions with Ms. Freeman after March 2021, suggesting she was actively working on these cases.  *See, e.g.*, *In re Mule Sky LLC*, No. 20-35561, ECF No. 10, Final Fee Appl., at 99 (Bankr. S.D. Tex. June 30, 2021) (in April 2021, Ms. Polnick billed for communications with Ms. Freeman on a motion to compel); *In re Katerra, Inc.*, No. 21-31861, ECF No. 1030, First Monthly Fee Statement, at 11, 25, 26

(Bankr. S.D. Tex. Sept. 14, 2021) (in June 2021, Ms. Wertz had multiple entries referencing interactions with Ms. Freeman). *See also* JW Opp. at ¶ 49 n.35 (claiming that Ms. Freeman did not bill any time in connection with only two of the 20 pre-March 2022, cases pending before Judge Jones). And Jackson Walker notably makes no claim that it took any similar step regarding work on, or compensation from, cases mediated by Judge Jones.

58.     Most importantly, these non-public actions did nothing to put other parties on notice of Jackson Walker's partner's romantic history with Judge Jones.

59.     But the fact that Jackson Walker asserts it took these steps demonstrates Jackson Walker's awareness of the obvious: a past romantic relationship with a judge or mediator raises at least a potential conflict of interest. Jackson Walker's awareness of this potential conflict of interest is also demonstrated by its contention that Ms. Freeman's March 2021 admission "contradicted the disclosures [Ms. Freeman] made to Jackson Walker when she joined the firm" in response its Lateral Partner Questionnaire. JW Opp. at ¶¶ 35, 183. According to Jackson Walker's filing, its Lateral Partner Questionnaire does not ask specifically about personal relationships with judges, only whether the incoming partner has "any possible conflicts of interest." JW. Opp. at ¶ 26. If a past romantic relationship did not constitute a possible conflict of interest, there would be no contradiction. Despite its recognition that a past relationship between Ms. Freeman and Judge Jones created a potential conflict of interest, Jackson Walker made the knowing and intentional decision not to disclose it.

**3.     Jackson Walker's Admitted Facts Show that by February 2022 It Knew the Relationship Was Ongoing, but It Again Made a Considered Decision Not to Disclose It.**

60.      Accepting Jackson Walker's as-yet untested story as true, its conduct went from bad to worse in February 2022. Jackson Walker admits that, on February 1, 2022, the firm learned that Ms. Freeman had an ongoing, not just past, relationship with Judge Jones, was told that she

was living with him, and was "given further information supporting the allegation." JW Opp. ¶ at 46. Jackson Walker knew this created a disqualifying conflict. Jackson Walker itself has asserted that if Ms. Freman had "an ongoing intimate relationship with Judge Jones" it "would be incompatible with [*Jackson Walker's*] continued participation in cases before Judge Jones." JW Opp. at ¶ 38 (emphasis added).

61.    Yet it took Jackson Walker *two months* to even approach Ms. Freeman about this revelation, which was confirmed as true on March 30, 2022.[7] During those two months, Jackson Walker applied to be retained as counsel in two more cases, *Seadrill New Finance* and in *4E Brands*—still with no disclosure. *See* JW Opp., Ex. 2, at 39–40 & Ex. 3, at 6–7.

62.    Jackson Walker insists that it acted reasonably and appropriately. But Jackson Walker's conduct was hardly the "good faith" effort "to comply with its legal and ethical obligations" that Jackson Walker claims. JW Opp. at ¶ 77.

63.    First, Jackson Walker claims it acted reasonably in "moving to exit Ms. Freeman from the firm." JW Opp. at ¶186. But Ms. Freeman remained at the firm for *ten months* after the February 1, 2022, disclosure. Notably, the eventual separation of Ms. Freeman in December 2022 is the *only* thing Jackson Walker did differently in March 2022 than it did in March 2021.

64.    Jackson Walker also claims that it (again) forbade Ms. Freeman from working on cases where Judge Jones presided and excluded from Ms. Freeman's compensation revenues from cases where he presided. JW Opp. at ¶ 186. But that claim is belied by the record, which shows that Ms. Freeman did work on such cases, even though Jackson Walker was careful not to bill their client for her time. *See, e.g.*, *In re 4E Brands Northamerica LLC*, No. 22-50009, ECF No. 189, JW First Monthly Fee Statement, at 19 (Bankr. S.D. Tex. July 26, 2022) (in March 2022, Ms.

---

[7] In this age of emails and cell phones, the lame excuse that there were vacations and spring breaks, JW Opp. at ¶ 47, is no explanation at all for such a delay.

Cameron billed time for drafting a memo summary to Ms. Freeman); *In re Sungard AS New Holdings*, No. 22-90018, ECF No. 570, JW First Interim Fee Appl., at 40 (Bankr. S.D. Tex. Aug. 17, 2022) (in May 2022, Ms. Argeroplos and Ms. Wertz billed for conversations with Ms. Freeman regarding U.S. Trustee reporting requirements); *In re LaForta – Gestão e Investimentos*, No. 22-90126, ECF No. 141, JW Third Monthly Fee Statement, at 8 (Bankr. S.D. Tex. Oct. 18, 2022) (in September 2022, Ms. Chaikin billed time for a call with Ms. Freeman regarding a hearing).

65.     Jackson Walker again makes no claim that Ms. Freeman did not work on or receive income from cases mediated by Judge Jones.   Ms. Freeman worked on and *attended* four[8] mediations with Judge Jones after Jackson Walker admittedly knew of the ongoing romantic relationship, yet it still did not disclose it in violation of Local Rule 16.4.I(2).[9]   Jackson Walker remained silent even when the *GWG* mediation led to Ms. Freeman's lucrative appointment as Wind-Down Trustee.[10]   *See In re GWG Holdings, Inc*., No. 22-90032, UST Obj. to Final Fee Appl., ECF No. 2415 at ¶¶ 54, 60 (Bankr. S.D. Tex. Mar. 29, 2024).

66.     The "reasonable" steps Jackson Walker took are meaningless in the absence of disclosure and are an extraordinary departure from how professionals should act.   Jackson Walker again made a considered decision, despite knowing that Ms. Freeman's relationship was ongoing, not to disclose the relationship in any of the 26 cases in which Judge Jones was then or later presiding as judge or acting as a mediator.

---

[8] In *IEH*, Ms. Freeman's firm was separately retained.   But that does not alter Jackson Walker's disclosure obligation under Local Rule 16.4.I(2).

[9] Jackson Walker claims, without citing any evidentiary support, that the mediation parties in *HONX* knew of the Jones-Freeman relationship before confirmation, JW Opp. at ¶ 60 n.40, but tellingly does not suggest that they knew about it before the mediation.

[10] In *GWG*, Ms. Freeman was a Jackson Walker partner when it applied to be retained, she worked as a contract attorney for Jackson Walker during the mediation, and Jackson Walker represented Ms. Freeman in her capacity as Wind-Down Trustee.   *See In re GWG Holdings, Inc*., Case No. 22-90032, UST Obj. to Final Fee Appl., ECF No. 2415 at ¶¶ 41, 47, 50–54, 58, 59–60 (Bankr. S.D. Tex. Mar. 29, 2024).

67.    What Jackson Walker's supposedly reasonable steps indisputably show is that Jackson Walker knew there was at least a potential conflict of interest.  *See In re eToys, Inc.*, 331 B.R. 176, 191 (Bankr. D. Del. 2005) (rejecting assertion that law firm "solved" a conflict of interest by hiring other counsel).  Indeed, Jackson Walker admits that it "knew the status quo was not appropriate."  JW Opp. at ¶ 50.  As the *eToys* court explained, while a firm may not need to disclose "every imaginable conflict," the disclosure requirements "certainly compel[] disclosure where, as here, the party had contemplated and discussed a specific situation involving a potentiality for conflict."  *eToys, Inc.*, 331 B.R. at 191 (internal quotation marks omitted).

68.    Ironically, while Jackson Walker extols its own actions for refusing to provide the disclosure Judge Jones and Ms. Freeman's counsel proposed because the statement that they had a "close personal relationship" was "insufficient" and "misleading," JW Opp. at ¶¶ 52, 56–57, it simultaneously insists that its own failure to disclose was perfectly acceptable.  But Jackson Walker's newly revealed *ex parte* communication with Judge Jones shows that the firm fully appreciated that it was deceptive to leave parties with the impression that Judge Jones and Ms. Freeman had a purely platonic relationship, a problem that could only be solved by disclosure. Jackson Walker's current position that its years-long silence was appropriate cannot be reconciled with its assertion that it previously had "insist[ed] on a full and complete disclosure."  *Id.* at ¶ 55.

69.    Additionally, the fact that Judge Jones called a Jackson Walker partner into an *ex parte* conference where he "insinuated that he was unhappy with Jackson Walker's insistence on . . . Ms. Freeman's exit" from the firm, JW Opp. at ¶ 55, is a real-world example validating that Judge Jones's partiality to Ms. Freeman, and his interest in her professional and financial well-being, could influence his treatment not just of her, but of Jackson Walker.

**D.** **Jackson Walker's Arguments that It Is Not Bound by the Disciplinary Rules Fail.**

70.     Jackson Walker makes several arguments as to why it is not bound by the Disciplinary Rules, but they are unavailing.

71.     First, Jackson Walker argues that violations of the Disciplinary Rules do not support a cause of action between private litigants.  *See* JW Opp. at ¶ 131.  However, the U.S. Trustee is not asserting a "private cause of action."  The U.S. Trustee seeks enforcement of the applicable law and sanctions for Jackson Walker's failure to comply with the Bankruptcy Code, Bankruptcy Rules, and Disciplinary Rules.[11]  *See Off. of the U.S. Trustee v. Jones (In re Alvarado)*, 363 B.R. 484, 492 (Bankr. E.D. Va. 2007) (concluding that "Mr. Jones violated numerous of the Virginia Rules of Professional Conduct," as well as violating certain Bankruptcy Code provisions and ordering sanctions). *Cf. In re Wheatfield Bus. Park LLC*, 286 B.R. 412, 417 (Bankr. C.D. Cal. 2002) ("The employment of counsel in a bankruptcy case is governed by § 327, Rule 2014, and the *applicable rules of professional conduct*.") (emphasis added).  The U.S. Trustee is not asserting a claim or seeking any compensation.

72.     Further, the Court has authority to discipline attorneys under the Disciplinary Rules because they have been incorporated by the Local Rules for the Southern District of Texas.  *See* S.D. Tex. Loc. R., App. A, R. 1.  The Local Rules for the Southern District of Texas provide that attorneys practicing before the court must follow the "minimum standard of practice," which

---

[11] Even if the Court finds that violations of the Disciplinary Rules do not by themselves support vacatur or sanctions, those rules are still instructive as to whether Jackson Walker violated its obligations under the Bankruptcy Code and Bankruptcy Rules warranting vacatur and sanctions. *See In re Palumbo Fam. Ltd. P'ship*, 182 B.R. 447, 468 (Bankr. E.D. Va. 1995) ("Likewise, we believe it is appropriate to use the Code of Professional Responsibility as a guide for determining whether an attorney is not 'disinterested,' and thus not entitled to compensation under 11 U.S.C. § 328(c).  Hence, a violation of Disciplinary Rule 5–106 is indicative, not dispositive, on the disinterestedness issue.").

requires compliance with the Disciplinary Rules.   S.D. Tex. Loc. R., App. A, R. 1(A).  The Local Rules also state that violation of the Disciplinary Rules "will be grounds for disciplinary action." S.D. Tex. Loc. R., App. A, R. 1(B).  And each federal court "has the power to control admission to its bar and to discipline attorneys who appear before it."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).

73.     Second, Jackson Walker contends that even if it the Disciplinary Rules applied, it cannot be applied to the firm, but only to individual attorneys.  *See* JW Opp. at ¶ 132.  This argument also fails because the Court's ability to discipline attorneys is not confined to only individuals.   The Local Rules provide the Court with broader disciplinary powers, stating "[v]iolation of the Texas Disciplinary Rules of Conduct will be grounds for disciplinary action, but the court is *not limited by that code*."  S.D. Tex. Loc. R., App. A, R. 1(B) (emphasis added). Thus, there is no limitation under the Local Rules exempting law firms from compliance with the Disciplinary Rules.   Notably, other courts have bound law firms to the requirements of the applicable ethical rules.  *See, e.g.*, *In re 38-36 Greenville Ave. LLC*, No. 21-2164, 2022 WL 1153123, at *4 (3d Cir. Apr. 19, 2022) (affirming disgorgement order against law firm based on its "repeated violations of the Bankruptcy Rules and the Code, along with counsel's lack of candor"); *ESC-Toy Ltd. v. Sony Interactive Ent. LLC*, No. 21-CV-00778-EMC, 2024 WL 1335079, at *11 (N.D. Cal. Mar. 27, 2024) (holding that "[the law firm] breached the duty of the candor owed to the court, and this provides another basis for disqualification of the firm"); *In re Universal Bldg. Prod.*, 486 B.R. 650, 660–61 (Bankr. D. Del. 2010) (concluding that "[Arent Fox LLP] and [Elliott Greenleaf & Siedzikowski, P.C.] did violate Rule 7.3 and Rule 8.4 of the Model Rules of Professional Conduct and of Delaware's Rules of Professional Responsibility. The Court finds this conduct sufficient reason to disqualify AF and EG from serving as counsel to the Committee in

this case."); *In re Meridian Auto. Sys.-Composite Operations, Inc.*, 340 B.R. 740, 750–51 (Bankr. D. Del. 2006) ("Milbank's violation of Model Rule 1.9 and dogged refusal to acknowledge the same warrant disqualification from further representation of the [informal committee of holders of only first lien debt] in these cases"). *See also* Tex. Comm. On Professional Ethics, Op. 522 (1997) (finding that a law firm had to take reasonable remedial actions when it found that its partner violated certain ethical rules).

74.     Third, Jackson Walker repeatedly states that it does not have the requisite knowledge to violate the Disciplinary Rules. *See* JW Opp. at ¶¶ 133, 135, 144, 146. But the opinions Jackson Walker relies on are inapposite, as they address whether attorneys have the necessary knowledge to report on misconduct of another attorney to a disciplinary authority. *See* JW Opp. at ¶ 133 n.157 & 159. The necessary inquiry here is whether Jackson Walker and its attorneys had the requisite knowledge when they violated the Disciplinary Rules. As discussed above, they did. *See supra* Part II.C.

75.     Additionally, if Ms. Freeman was prohibited from engaging in any conduct, then Jackson Walker would have also been prohibited under the same Rules, notwithstanding what knowledge it had. *See* Disciplinary Rule 1.06(f) ("If a lawyer would be prohibited by this Rule from engaging in particular conduct, no other lawyer while a member or associated with that lawyer's firm may engage in that conduct."). In other words, when Ms. Freeman violated her ethical duties by failing to disclose the relationship, Jackson Walker and its attorneys also violated their ethical duties because they were prohibited from the same actions. *Cf.* Tex. Comm. On Professional Ethics, Op. 666 (2016) ("The Committee appreciates that the firm-wide imputation of spousal conflicts may in some cases lead to harsh results but those results are dictated by the current provisions of Rule 1.06(f).").

76.     Fourth, Jackson Walker repeatedly contends that the firm acted reasonably so it could not have violated the Disciplinary Rules.  *See* JW Opp. at ¶ 136, 139, 144, 146.  As addressed previously, Jackson Walker's actions were neither reasonable nor adequate.[12]  *See supra* Part II.C.2–3.

77.     Lastly, Jackson Walker argues that its failure to disclose the relationship to the Court does not fall within the requirements of its duty of candor, ignoring the Local Rules.  First, the Local Rules provide that all lawyers owe the court "candor."  S.D. Tex. Local Rules, Appx. D, Guideline B.  Jackson Walker's failure to disclose its partner's relationship with Judge Jones violated this duty.  *See, e.g., In re Bradley*, 495 B.R. 747, 783 (Bankr. S.D. Tex. 2013) (holding failure to disclose violated this Guideline).

78.     Second, Disciplinary Rule 3.03(a)(1) prohibits knowingly making a false statement to the court.  Jackson Walker incorrectly asserts that "[t]he U.S. Trustee does not claim that JW made a false statement to the Court, nor could he."  JW Opp. ¶ 135.  Jackson Walker made a false statement every time it represented that it was disinterested and eligible to be retained as counsel. *See* 60(b) Mot., Part IV.C.1; 60(b) Mot. – Med., Arg. Part I.C.1.   And the duty of candor does not end at the moment of filing; it continues "until remedial legal measures are no longer reasonably possible."  Disciplinary Rule 3.03(c).

79.     Jackson Walker thus cannot limit its duty of candor to Disciplinary Rule 3.03(a)(3), which prohibits attorneys from "fail[ing] to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act."  *Compare, e.g., In re Brown*, 511 B.R. 843, 852 (Bankr. S.D. Tex. 2014) (sanctioning non-disclosure as violation of duty of candor

---

[12] Jackson Walker cannot blame the pandemic for its failure to conduct a diligent inquiry upon learning of "allegations" that Ms. Freeman had a relationship with Judge Jones. JW Opp. at ¶ 139. If Jackson Walker was able to continue representing its clients through the pandemic, it could surely conduct an internal investigation during that period.

because it amounted to false statement).  But Jackson Walker violated this rule, too.  Both Ms. Freeman and Jackson Walker's failure to disclose qualify as fraudulent acts upon the Court.  *See infra* II.G.2.d.

**E.      The Court Should Vacate Its Prior Orders Approving Jackson Walker's Retention and Fee Applications.**

80.      The U.S. Trustee established in his Motion that the orders approving Jackson Walker's retention and fee applications should be vacated under Rule 60(b)(6).  *See* 60(b) Mot., Part IV.F; 60(b) Mot. – Med., Arg. Part II.A   As explained in the U.S. Trustee's Motion, Rule 60(b)(6) is "a residual clause used to cover unforeseen contingencies; that is, it is a means for accomplishing justice in exceptional circumstances."  *Steverson v. GlobalSantaFe Corp*., 508 F.3d 300, 303 (5th Cir. 2007) (quoting *Stipelcovich v. Sand Dollar Marine, Inc.,* 805 F. 2d 599, 604–05 (5th Cir. 1986)).  Jackson Walker's repeated failure to act in compliance with applicable statutes and rules throughout Ms. Freeman's employment rises to "extraordinary circumstances," justifying relief under Rule 60(b)(6).

81.      Jackson Walker cites *Seven Elves, Inc. v. Eskenazi*, which sets forth eight factors[13] that should inform a court's analysis when determining whether "extraordinary circumstances" exist to support relief under Rule 60(b).  *See* JW Opp. at 32 n.61 (citing 635 F.2d 396, 402 (5th Cir. 1981)).  Those factors are: "(1) [t]hat final judgments should not lightly be disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to achieve substantial justice; (4) whether the motion was made within a reasonable time; (5) whether if the judgment was a default or a dismissal in which there was no consideration of the merits the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgments, and there is merit in the movant's claim or defense;

---

[13] Jackson Walker only lists seven factors in its opposition.

(6) whether if the judgment was rendered after a trial on the merits the movant had a fair opportunity to present his claim or defense; (7) whether there are intervening equities that would make it inequitable to grant relief; and (8) any other factors relevant to the justice of the judgment under attack."  635 F.2d at 402

82.     Jackson Walker, however, fails to note that all applicable factors listed by the Fifth Circuit support vacatur here.  *See id.*  With respect to the first two factors, the U.S. Trustee does not approach this vacatur lightly nor seek it as a substitute for an appeal.  Rather, vacatur is necessary due to the extraordinary nature of Jackson Walker's conduct in 33 cases, and an appeal would not have been possible due to the undisclosed nature of the connection.  *Id.*  The third factor favors the U.S. Trustee because "substantial justice" would be served by vacating orders that were entered notwithstanding the undisclosed conflict.  *Id.*  The fourth factor supports the U.S. Trustee because he filed the 60(b) Motions within a "reasonable time" after the news of the undisclosed relationship became public.  *Id.*  The fifth factor does not apply since there is no dismissal or default judgment here.  *Id.*  The sixth and seventh factors also favor the U.S. Trustee because the parties were not provided a "fair opportunity" to object to Jackson Walker's retention or compensation based on Ms. Freeman's relationship with Judge Jones nor seek the Judge's recusal, and the "intervening equities" (*i.e.*, the news of the secret relationship in October 2023) make it "inequitable" to allow the retention and compensation orders to stand.  *Id.*  Finally, the eighth factor (the catch-all) also favors the U.S. Trustee because the erosion of public confidence in the judicial system weighs in favor of vacatur.  *Id.*

83.     In addition, courts have not hesitated to grant Rule 60(b)(6) relief to address conflicts of interest and disclosure failures by bankruptcy professionals.  60(b) Mot. – Med. at ¶ 175.  *See, e.g.*, *In re eToys, Inc.*, 331 B.R. 176, 188 (Bankr. D. Del. 2005) (granting Rule 60(b)(6)

relief because professionals did not disclose conflicts of interest that would have barred their retention"); *In re Southmark Corp.*, 181 B.R. 291, 295–98 (Bankr. N.D. Tex. 1995) (granting relief under Rule 60(b)(6) from final fee order that had been entered nearly three years earlier); *In re Benjamin's-Arnolds, Inc.*, No. 90-6127, 1997 WL 86463, at *10 (Bankr. D. Minn. Feb. 28, 1997) (holding that "the failure of an attorney employed by the estate to disclose a disqualifying conflict of interest, whether intentional or not, constitutes sufficient 'extraordinary circumstances' to justify relief under Rule 60(b)(6)").  To deny Rule 60(b)(6) relief would only "reward conflicted attorneys for failing to disclose their conflicts beyond the one-year period."  *Benjamin's-Arnolds*, 1997 WL 86463, at *10.

84.     Jackson Walker's response, that a secret romantic and financial relationship between a firm partner and the presiding judge who entered the retention and compensation orders is not a sufficiently extraordinary circumstance under Rule 60(b)(6), is mistaken.  If an undisclosed financial and intimate relationship between the presiding judge and an estate-retained professional firm's partner is not an exceptional circumstance justifying relief from judgment under Rule 60(b)(6), it is hard to conceive any circumstance that would.

85.     Indeed, the Fifth Circuit believed the situation sufficiently exceptional to lodge a public ethics complaint against Judge Jones.  This occurred almost immediately after Business Insider broke the story that Jackson Walker had known was true for years.  As a result, Judge Jones stepped down from the complex case panel, and resigned soon after.  *See* General Order 2023-10, Order Designating Complex Case Panel (Oct. 13, 2023).  That is undoubtedly exceptional and unforeseen.

86.     Jackson Walker's reliance on its alleged pre-2022 ignorance and its supposedly reasonable steps—which included the deliberate decision not to disclose the secret relationship—

is off point.  Jackson Walker's excuses do not change the fundamental fact that parties did not have the information necessary to object to Jackson Walker's retention or compensation applications or to seek recusal of Judge Jones.  And it is the revelation of the previously secret relationship between Ms. Freeman and Judge Jones that warrants Rule 60(b)(6) relief.

87.     Jackson Walker argues that it is "ironic" that the U.S. Trustee urged disclosures be made to the judge who knew about the relationship who himself had ethical duties that he violated.  JW Opp. at ¶ 1.  Jackson Walker again misses the point.  Parties in interest were entitled to know that the presiding or mediating judge was in an intimate relationship and shared a jointly owned home with a Jackson Walker partner.  Similarly, Jackson Walker argues that neither the U.S. Trustee nor any party in interest challenged Jackson Walker's retention or compensation.  But because of Jackson Walker's deceit, no one knew that a basis existed to challenge those orders.

88.     The inability to seek recusal of Judge Jones based on the undisclosed relationship also warrants Rule 60(b)(6) relief under the *Liljeberg* factors. 60(b) Mot at ¶¶ 118–22.  *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988).  Ignoring the cases cited above that grant Rule 60(b) relief based on professionals' non-disclosures, *supra* ¶ 83, Jackson Walker argues that it passes *Liljeberg*'s "harmless error" test.  JW Opp. ¶ 149.  Specifically, Jackson Walker alleges that there is no risk of injustice in these cases or in future chapter 11 cases and that public confidence will not be undermined in the bankruptcy court and bankruptcy system if this Court denies relief to the U.S. Trustee.

89.     Jackson Walker's arguments defy logic and reality.  Having Judge Jones preside over these proceedings and allowing Jackson Walker to exempt itself from stringent obligations under the Code, Bankruptcy Rules, and Disciplinary Rules is unjust to all other parties in the

proceedings and signals to other professionals that non-compliance with their many duties will not result in any financial or legal consequence.

90.     Despite Jackson Walker's assertion that there was not a "whisper of favoritism, impropriety, and misconduct," *id*. at ¶ 162, scrutiny of its conduct has been widespread. *See, e.g.*, *Van Deelen v. Jones*, No. 4:23-cv-3729, ECF No. 10, Compl. (asserting various claims against Jackson Walker including fraud, RICO violations, aiding and abetting breach of fiduciary duties); *see also* Exhibit 1 - *Van Deelen v. Jones*, No. 4:23-cv-3729, Hr'g Tr. at 72:21, 74:22–23 (S.D. Tex. June 6, 2024) (Judge Moses stating that "[i]t is unfair, counsel.  It is.  I mean, there's no doubt that it's unfair" when addressing whether the plaintiff had a "fair hearing" at the bankruptcy court). Media coverage also reflects that the broad and unsurprising view that it was improper for a law firm to keep secret that its partner had a romantic relationship with a judge who presided over and mediated cases where her firm represented a party. *See, e.g.*, Exhibit 4 - Alex Wolf, *Jackson Walker in Legal Hot Seat Following Judge Romance Scandal*, Bloomberg Law (Mar. 26, 2024) ("Law firms are obligated to ensure their people operate within ethical guardrails, [Professor Nancy] Rapoport said."); Exhibit 5 - Dakin Campbell, *The Incredible Oblivion of Marvin Isgur*, Business Insider (June 2, 2024) (stating that despite Ms. Freeman's departure from Jackson Walker, "Jackson Walker appeared to keep knowledge of the relationship to itself. The firm's attorneys continued to recommend Freeman for legal work on cases before the Southern District.").

91.     This "unimaginably bad scandal" erodes confidence in the bankruptcy system in the Southern District of Texas.  Exhibit 4 - Alex Wolf, *Jackson Walker in Legal Hot Seat Following Judge Romance Scandal*, Bloomberg Law (Mar. 26, 2024) (quoting Professor Nancy Rapoport). Vacatur is necessary to restore that confidence by allowing all parties to litigate Jackson Walker's retention and compensation applications before an impartial judge.

92.     Jackson Walker asserts that no reasonable person would interpret this Court's denial of the U.S. Trustee's Motion as "a license to ignore disclosure obligations or a tacit endorsement of former Judge Jones's alleged misconduct."  JW Opp. at ¶ 156.  But that is exactly the ruling Jackson Walker seeks, one that allows professionals to ignore disclosure obligations with no consequence.

93.     Jackson Walker argues a litany of other reasons why it claims there are no extraordinary circumstances here justifying vacatur, mostly that Jackson Walker did good work that benefitted the estates, it did not bill that much, and even then it already voluntarily reduced its fees in some cases.  JW Opp. at ¶ 78.  However, even if Jackson Walker's assertions on these issues are true, they do not mitigate the extraordinary circumstances that warrant vacatur: Jackson Walker's failure to disclose, for years, that its partner was romantically involved with and living with Judge Jones in a house they jointly owned.

**F.     The Court Should Order Disgorgement in the Full Amount of Fees Paid to Jackson Walker Due to the Firm's Egregious Misconduct.**

94.     The U.S. Trustee established in his Motion that there are three sources of authority for this Court to deny Jackson Walker's fees and order it to return all fees paid: (1) 11 U.S.C. § 328(c); (2) the Court's broad supervisory powers over attorneys employed by the bankruptcy estate; and (3) the Court's inherent authority to impose sanctions for violations of this Court's rules.  *See, e.g.,* 60(b) Mot., Part III.A–B; 60(b) Mot. – Med., Arg. Part II.  Jackson Walker's arguments that the Court should not order a return of all fees fail.  Importantly, while the U.S. Trustee seeks to vacate the retention and compensation orders, vacating those orders is not required for the Court to sanction Jackson Walker for its misconduct by ordering it to disgorge fees.  *See, e.g., Am. Int'l Refinery*, 676 F.3d at 465–66 (affirming disgorgement of $135,000 as sanction for

law firm's failure to disclose connections without a Rule 60(b) motion); *Matter of Prudhomme*, 43 F.3d 1000, 1003 (5th Cir. 1995) (affirming disgorgement without a Rule 60(b) motion).

> **1.    Section 328(c) Authorizes the Court to Order Jackson Walker to Return the Compensation Received in These Cases.**

95.     Jackson Walker argues that the U.S. Trustee "misconstrues the temporal limitation" of section 328(c) because "the statute does not allow for compensation to be denied for a relationship that arose after a professional's employment has concluded." JW Opp. at ¶ 178.  This assertion is wholly irrelevant because Ms. Freeman's relationship with Judge Jones did not arise only after Jackson Walker's employment was concluded.  Ms. Freeman has admitted that she had a romantic relationship with Judge Jones, co-owned a house with him, and was the executor of, and a beneficiary under, his will, since 2017, before she began her employment with Jackson Walker.  *See* Exhibit 2 - Elizabeth Freeman's Responses to United States Trustee's Requests for Admission*, In re IEH Auto Parts Holding, Inc.*, No. 23-90054, Resp. 10 (admitting relationship as of April 6, 2023), Resp. 11 (admitting romantic relationship began before 2017); Resp. 12 (admitting she had a joint tenancy with Judge Jones since 2017); Exhibit 2 - Elizabeth Freeman's Responses to United States Trustee's First Set of Interrogatories*, In re IEH Auto Parts Holding, Inc.*, No. 23-90054, Resp. 3.

96.     Thus, for *every* case, Ms. Freeman's relationship with Judge Jones existed before Jackson Walker's services were concluded.  By virtue of that relationship, Jackson Walker was not disinterested and held an adverse interest to the estate and its creditors while it was employed under section 327 or 1103.  "And since section 327(a) is designed to limit even appearances of impropriety to the extent reasonably practicable, doubt as to whether a particular set of facts gives rise to a disqualifying conflict of interest normally should be resolved in favor of disqualification."

*Rome v. Braunstein*, 19 F.3d at 60.  The Court thus may deny Jackson Walker all compensation under section 328(c).

97.     Similarly off-base is Jackson Walker's argument that confirmed plans in some cases support exempting it from complying with sections 327 through 331 and 1103 once the confirmation date has passed.  The confirmed plans say only that those Bankruptcy Code provisions will not apply to services rendered after the confirmation date—they do not purport to give a free pass to Jackson Walker's failure to comply with its statutory obligations when it served as counsel retained by the estate before confirmation.  For example, the *EXCO* confirmation order specifies: "Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation *for services rendered after such date* shall terminate."  *In re EXCO Resources, Inc.*, No. 18-30155, ECF No. 2128 at ¶ 122 (Bankr. S.D. Tex. June 18, 2019) (emphasis added).[14]  The plans do not, and cannot, immunize estate professionals from complying with the law.  *See, e.g., Denison v. Marina Mile Shipyard, Inc. (In re New River Dry Dock, Inc.)*, 497 F. App'x 882, 886 (11th Cir. 2012) ("The plan's release of liability against professionals did not affect the bankruptcy court's authority over the fees paid to those professionals.").

---

[14] Similar language exists in the plans and/or confirmation orders for the other cases cited by Jackson Walker.  *See In re Covia Holdings Corp.*, No. 20-33295 ECF No. 1029, Art. II.B.4 (Bankr. S.D. Tex. Dec. 14, 2020) ("From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation *for services rendered after such date* shall terminate . . . .") (emphasis added); *In re Volusion LLC*, No. 20-50082, ECF No. 128, Art. II.D (Bankr. S.D. Tex. Nov. 20, 2020) ("Upon the Confirmation Date, any requirement that Professionals and ordinary course Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation *for services rendered after such date* shall terminate . . . .") (emphasis added); *In re Bouchard Transp., Co., Inc.*, No. 20-34682, ECF No. 1293, Art. II.C.4 (Bankr. S.D. Tex. Aug. 23, 2021) (Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation *for services rendered after such date* shall terminate . . . .") (emphasis added).

98.     For pre-March 2022 cases only, Jackson Walker additionally argues that section 328(c) does not apply because it "did not have knowledge of any ongoing intimate relationship." JW Opp. at ¶ 179.  Again, Jackson Walker fails to acknowledge that a partner's knowledge is imputed to the partnership, and also conflates the existence of a conflict of interest with knowledge of it.   But section 328(c) says compensation may be denied if, "at any time" during the employment, the person "*is* not a disinterested person" or "*holds* an interest adverse to the estate," 11 U.S.C. § 328(c) (emphasis added)—not if, at any time during the employment, the person *becomes aware* it is not disinterested or holds and adverse interest.   "Whether [a law firm] inadvertently or intentionally neglected to inform the court of its conflicts is of no import." *Electro-Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince)*, 40 F.3d 356, 361 (11th Cir. 1994) (reversing holding that law firm qualified for fees as an abuse of discretion); *see also eToys, Inc.*, 331 B.R. at 194 (holding an "inadvertent oversight . . . does not excuse the failure" to disclose a conflict of interest).  Thus, where a lack of disinterestedness or an adverse interest has been shown, as it has here, "'no more need be shown . . . to support a denial of compensation.'"  *Consol. Bancshares,* at 1256 (quoting *Woods v. City Nat'l Bank and Tr. Co. of Chi.*, 312 U.S. 262, 268 (1940).

99.     Further, Jackson Walker's alleged lack of knowledge has not been established either legally or factually.  *See supra* Part II.C.1.a–b (Ms. Freeman's knowledge is imputed to Jackson Walker).  Jackson Walker never explains *whose* knowledge counts as the firm's knowledge, or why Ms. Freeman's knowledge does not count while the knowledge of other unnamed partners after March 2022 does count.   Nor does it acknowledge that discovery has barely begun into Jackson Walker's knowledge.  But Jackson Walker's admissions to date show that Jackson Walker knew of at least a past romantic relationship by March 2021, and an ongoing romantic relationship no later

than March 2022—both of which are sufficient to create a conflict of interest—yet it made a deliberate decision not to disclose that information.

> ### 2. An Order Requiring Jackson Walker to Return All Fees Is Within the Court's Broad Supervisory Powers Over Attorneys Retained by the Estate.

100. The U.S. Trustee established in its 60(b) Motions that, under Fifth Circuit precedent, courts exercising their "broad supervisory powers" over attorneys employed by the estate, *Consol. Bancshares, Inc.,* 785 F.2d at 1254, may order disgorgement and "deny *all* compensation to professionals who fail to make adequate disclosure," *Am. Int'l Refinery, Inc.*, 676 F.3d at 465–66 (affirming disgorgement of $135,000 as sanction for law firm's failure to disclose connections); *see also Prudhomme*, 43 F.3d at 1003–04 (affirming disgorgement).

101. Essentially ignoring this Fifth Circuit precedent, Jackson Walker argues that the Court's authority to deny fees may only be used to enforce the provisions of the Bankruptcy Code, court rules, and orders of the Court. JW Opp. at ¶ 181. But Fifth Circuit law establishing the Court's authority to deny all fees, and order disgorgement, for failures to disclose is soundly rooted in the Bankruptcy Code's provisions regarding the estate's employment of professionals. *See Prudhomme*, 43 F.3d at 1003 (citing 11 U.S.C. §§ 327 and 1107(a) for its holding that "the court's broad discretion in awarding and denying fees paid in connection with bankruptcy proceedings empowers the bankruptcy court to order disgorgement as a sanction to debtors' counsel for nondisclosure"); *see also Am. Int'l Refinery, Inc.*, 676 F.3d at 465–66; *Consol. Bancshares*, 785 F.2d at 1255. And all but a few of the retention orders in these cases required disclosure. *See infra* n.16.

102. Unsurprisingly, Jackson Walker cites no case holding that a court lacks authority to deny fees or order disgorgement based on a law firm's failure to disclose a romantic relationship

between one of its partners and a presiding judge or mediator.  The Court's authority to do so is firmly grounded in the Bankruptcy Code, court rules, and Fifth Circuit precedent.

### 3.     This Court Has Inherent Authority to Order Jackson Walker to Return Compensation as a Sanction for Violating this Court's Rules.

103.    As established in the U.S. Trustee's motions (*see* 60(b) Mot., Part IV.G.3; 60(b) Mot. – Med., Arg. Part II.B), the Court also has inherent authority to impose disciplinary sanctions "beyond the return of compensation." *Baker v. Cage (In re Whitley)*, 737 F.3d 980, 987 (5th Cir. 2013).  Jackson Walker acknowledges this power but argues that inherent-authority sanctions— unlike the Court's authority to order a return of fees under section 328(c) and its broad authority over attorneys retained by the estate—are limited to bad faith or willful misconduct.  JW Opp. at ¶ 181 n.222.  Even if that is true,[15] Jackson Walker's admissions so far show that it has engaged in bad faith and willful misconduct.  *See also infra* Part II.G.2.d.ii.

104.    Attorneys act in bad faith when they knowingly take actions that violate their obligations as lawyers, and this includes when they act intentionally and "close their eyes to the obvious." *Williams v. Lockheed Martin, Corp.*, 990 F.3d 852, 867–68 (5th Cir. 2021).  *See also Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950, 953–55 (5th Cir. 2001) (affirming $15,000 sanction payable to the court, holding finding of bad faith was supported by counsel's intentional act of filing document publicly despite confidentiality provision in settlement agreement where counsel lacked "any plausible good faith explanation for their conduct").  And a knowing failure to disclose a conflict of interest "constitutes willful misconduct." *eToys, Inc*., 331 B.R. at 187; *see also id*. at 188 (failure to disclose fact that would bar retention "would constitute a fraud on the Court").

---

[15] *See Williams v. Lockheed Martin, Corp.,* 990 F.3d 852, 867 n.70 (5th Cir. 2021) (explaining that a court's inherent power to "shift attorney's fees" requires bad faith but noting that "not all sanctions imposed under the court's inherent powers require a finding of bad faith") (citing *Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 n.11 (3d Cir. 1994)).

105.    Jackson Walker engaged in bad faith and willful misconduct because it made a knowing and intentional decision not to disclose that Ms. Freeman had a past or ongoing romantic relationship with Judge Jones, *see supra* Part II.C.; *infra* Part II.G.2.d.ii, in violation of contrary to its obligation to do so under this Court's rules and the retention orders entered in most of the cases.[16]    Contrary to Jackson Walker's contention, even if (counterfactually) the willful misconduct is attributable to Ms. Freeman alone—and the firm does not dispute that she engaged in such misconduct—the firm may be sanctioned because "where, as here, an attorney acts in bad faith, his [or her] bad faith conduct is imputed to the firm that employs him or her." *Bradley*, 495 B.R. at 791.  As in *Toon*, although Jackson Walker claims it acted in good faith, "counsel have not pointed to one case standing for the proposition," 250 F.3d at 953, that a law firm need not disclose that its partner has, or used to have, a romantic relationship with a presiding judge or mediator. There is simply no good faith reason for Jackson Walker not to have disclosed Ms. Freeman's relationship with Judge Jones.

### 4.    Jackson Walker's Demand for Leniency Is Unconvincing.

106.    As established in the U.S. Trustee's motions, denial of all fees is warranted in these cases. *See, e.g.,* 60(b) Mot., Part IV.G; 60(b) Mot. – Med., Arg. Part II.  Denial of all compensation is the default sanction for nondisclosure of all facts bearing upon counsel's eligibility to be employed by the estate.  *See Prudhomme*, 43 F.3d at 1003; *Futuronics Corp. v. Arutt, Nachamie,*

---

[16] The only cases that do not include this provision in the retention orders explicitly setting forth ongoing disclosure requirements are *EXCO Resources, Inc.*, *Westmoreland Coal Company*, and *Brilliant Energy, LLC*.  Nevertheless, Jackson Walker attorneys acknowledged their duty in these cases to supplement their disclosures in the declarations attached to Jackson Walker's retention applications.

*& Benjamin (In re Futuronics Corp.)*, 655 F.2d 463, 469–71 (2d Cir. 1981); *In re EWC, Inc.*, 138 B.R. 276, 281–82 (Bankr. W.D. Okla. 1992).[17]

107.    As the Tenth Circuit has explained, the bankruptcy system is "built upon the principle of full and candid disclosure." *SE Property Holdings, LLC v. Stewart (In re Stewart)*, 970 F.3d 1255, 1264 (10th Cir. 2020) (quotation marks omitted). "It is these disclosures which allow the public to have confidence in the system . . . . Without those beliefs, public confidence in the bankruptcy process, and perhaps far more, is placed at risk." *Id.* at 1264–65 (quotation marks omitted). Because these disclosure obligations "are difficult if not impossible to police," and those who fail to disclose are unlikely to be caught, sanctions for disclosure violations "must sting hard." *Id.* at 1265.

108.    Jackson Walker's conduct is a case in point. Jackson Walker violated its disclosure obligations for years in over two dozen cases. And its nondisclosure was not the result of inadvertence, but carefully considered and intentional. As in *Futuronics*, "[w]e deal in this case not with isolated instances of oversight but with a total pattern of conduct which betrays a callous disregard of the professional obligations undertaken in these bankruptcy proceedings." *Futuronics Corp.*, 655 F.2d at 471 (quotation marks omitted). But for intrepid investigative reporting in October 2023, the public would never have discovered the truth about the years-long, undisclosed relationship between judge and lawyer because Jackson Walker concealed it from

---

[17] *See also, e.g., SE Property Holdings, LLC v. Stewart (In re Stewart)*, 970 F.3d 1255, 1268 (10th Cir. 2020) (holding denial of all fees is the "default sanction" for disclosure violations and bankruptcy court abused its discretion by ordering the return of only a small fraction of fees, rather than all fees, for a failure to disclose); *Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis)*, 113 F.3d 1040, 1045 (9th Cir. 1997) (affirming order requiring return of both pre-petition and post-petition funds received by debtor's attorney); *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 478 (6th Cir. 1996) (affirming grant of relief under section 329 and Rule 2016 but reversing as to amount due to bankruptcy court's refusal to order return of entire retainer).

public knowledge, even while filing employment and compensation applications in 2022 with admitted knowledge of the undisclosed relationship.

109.    Jackson Walker argues that this Court has discretion to order it to return less than all fees.  Jackson Walker's defense relies largely on its claims that—as a firm divorced from the people that constitute it—it did not know about Ms. Freeman's relationship with Judge Jones and that, once it knew, it took "reasonable" and "appropriate steps."  *See* JW Opp. at ¶ 186.  But once again, Jackson Walker fails to acknowledge that Ms. Freeman's knowledge was imputed to the firm under Texas agency and partnership law.  Even taking Jackson Walker's assertions as true, however, its supposedly "reasonable" and "appropriate steps" were entirely inadequate and do not mitigate its misconduct.  Jackson Walker consistently and intentionally opted against taking the most important step: disclosing the relationship to the parties and the Court.  Jackson Walker's actions showed an egregious disregard for the Bankruptcy Code, Bankruptcy Rules, ethical rules, and its fiduciary duties.  *See supra* Part II.C.2–3 (discussing Jackson Walker's failures to act appropriately).

110.    Jackson Walker also argues that it should get to keep its fees because no harm resulted from its misconduct and that its fees were reasonable.  *See*, *e.g*., JW Opp. at ¶¶ 11, 12, 78, 150, 152, 157, 160, 174, 186.  Even if that were true, Jackson Walker misses the critical point: The "conduct of bankruptcy proceedings not only should be right but must seem right."  *Knapp v. Seligson (In re Ira Haupt & Co.)*, 361 F.2d 164, 168 (2d Cir. 1966).  The firm's self-interested view disregards the integrity of the bankruptcy process.  *See, e.g., Stewart*, 970 F.3d at 1264–65.

111.    Indeed, the Supreme Court long ago dispensed with Jackson Walker's "no harm, no foul" defense and conclusively established that all compensation may be denied in a reorganization proceeding for those operating under a conflict of interest, notwithstanding "fraud or unfairness

[were] not shown to have resulted." *Woods v. City Nat.*, 312 U.S. at 268 (Douglas, J.) (decided under the Code's predecessor, the 1938 Chandler Act).  Nothing more than the conflict need be shown "to support a denial of compensation." *Id.  See also West Delta Oil*, 432 F.3d at 358 n.32 (holding that where professional had adverse interest, "[i]t is irrelevant that no evidence exists pointing to actual prejudice to the estate"); *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 881 (9th Cir. 1995) ("a disclosure violation may result in sanctions 'regardless of actual harm to the estate'") (quoting *In re Maui 14K, Ltd.*, 133 B.R. 657, 660 (Bankr. D. Haw. 1991)); *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 849 (B.A.P. 10th Cir. 1997) (same); *In re Fretter, Inc.*, 219 B.R. 769, 776 (Bankr. N.D. Ohio 1998) (same); *In re Digioia*, No. 22-00004, 2023 WL 1785732, at *5 (Bankr. D.D.C. Feb. 3, 2023) (fees may be disgorged as sanction for non-disclosure even where client has not questioned fees).

112.    It is also not a defense to claim that one's loyalty was not weakened by a conflict of interest:

> A fiduciary who represents security holders in a reorganization may not perfect his claim to compensation by insisting that although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one. Only strict adherence to these equitable principles can keep the standard of conduct for fiduciaries "at a level higher than that trodden by the crowd."

*Woods*, 312 U.S. at 269 (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928).

113.    In the decades since the Supreme Court decided *Woods*, bankruptcy courts have regularly cited the case as "the decision which provides the basis for disgorgement of fees for conflicts of interest in bankruptcy cases." *Quiat v. Berger (In re Vann)*, 136 B.R. 863, 869 (D. Colo. 1992).  In *Vann*, the court stated that trying to determine how much the "attorney's unethical conduct deplete[d] the value of his services" was not only contrary to *Woods*, but it improperly

"puts the burden on the court to prove the worth of the claimed fees when that burden is rightfully the attorney's." *Id.* at 871.

114.    In penalizing professional misconduct, "[a] bankruptcy court does not have to calculate how much the unethical conduct depleted the value of the attorney's service, but may, in its discretion, deny compensation in whole or in part.  It may also order disgorgement of all fees already paid."  *In re Parklex Assocs., Inc.*, 435 B.R. 195, 209 (Bankr. S.D.N.Y. 2010) (internal quotation marks omitted).  Moreover, it is impossible to prove that outcomes and decisions would have been different absent the undisclosed relationship between Judge Jones and Ms. Freeman.[18]

115.    Jackson Walker likewise argues that the Court should deny relief in the mediated cases because all parties were allegedly satisfied with Judge Jones's performance in the mediation and Judge Jones personally did not enter any orders in the underlying bankruptcy case.  JW Opp. at ¶¶ 172, 174.

116.    That argument, however, misconstrues the relief sought by the U.S. Trustee.  The U.S. Trustee does not seek to unwind the results of the mediation or vacate the confirmation order.  Rather, the U.S. Trustee's 60(b) Motion is directed to the compensation received by Jackson

---

[18] While the U.S. Trustee cannot show how cases would have proceeded in an alternate universe, there is one indication that events may have proceeded differently if Jackson Walker had not tipped the scale in its favor.  *In re Tehum Care Serv., Inc.*, No. 23-90086 demonstrates that the undisclosed relationship between Judge Jones and Ms. Freeman likely had a significant financial impact in the cases that Judge Jones mediated.  Judge Jones was appointed to mediate a global settlement that included, among other matters, the settlement of a fraudulent transfer claim against a party represented by Ms. Freeman.  That mediation resulted in a global settlement, reflected in a proposed plan of reorganization, in which the estate's claims would be released in return for a $37 million contribution by Ms. Freeman's client and the other settlement parties.  *See* No. 23-90086, ECF No. 1072, Second Am. Chapter 11 Plan, at 17 (Bankr. S.D. Tex. Oct. 27, 2023).  Following the resignation of Judge Jones, however, the bankruptcy court ordered a new mediation before a different mediator.  Although that mediation involved the same claims and same parties as the mediation under Judge Jones, the resulting proposed settlement increased the settlement payment to $54 million.  *Tehum Care Serv.*, No. 23-90086, ECF No. 1259, Settlement Mot. (Bankr. S.D. Tex. Jan. 16, 2024).  As such, the participation of Judge Jones in *Tehum* arguably created a $17 million benefit for Ms. Freeman's client, and a $17 million detriment to the estate.

Walker because it violated its disclosure obligations and was subject to a disqualifying conflict of interest.  As the U.S. Trustee explained above, these facts warrant disgorgement even if the outcome of the underlying case was unaffected.  *See supra* ¶ 111.

117.    For this reason, Jackson Walker's reliance on *CEATS, Inc. v. Cont'l Airlines, Inc.*, 755 F.3d 1356, 1362 (Fed. Cir. 2014), to excuse its misconduct is misplaced.  That decision did not involve a court-supervised professional, and the movant in that case sought relief from a trial judgment, not a compensation order.  Although the Federal Circuit in that case declined to grant Rule 60 relief because there was no evidence that an unbiased mediator would have resulted in a different jury verdict, the same concerns do not exist here, where Jackson Walker's liability for disgorgement is independent of the outcome of the underlying bankruptcy case.

118.    In sum, the Court should deny all fees because Jackson Walker's conduct was knowing, intentional, repeated, and caused severe reputational damage to this Court and the bankruptcy system.  Allowing fees to a law firm that time-and-again made the decision not disclose that its partner was romantically involved with the presiding judge or mediator would render impartiality requirements meaningless.  Denial of all fees is necessary not just to punish Jackson Walker but also to deter future misconduct by others.  *See, e.g., Prince*, 40 F.3d at 361 (reversing holding that law firm qualified for fees).

**G.      Jackson Walker's Attempts to Evade Any Consequence for Its Disclosure Violations Fail.**

**1.      The U.S. Trustee Has Standing to Seek Vacatur of the Retention and Compensation Orders, Disgorgement of Compensation, and Sanctions Against Jackson Walker.**

119.    Jackson Walker contests the U.S. Trustee's standing to seek vacatur of orders approving the firm's retention and compensation, the return of all fees and expenses that it received, and inherent authority sanctions against Jackson Walker.  JW Opp. at ¶¶ 80–89.

120.     The standing and authority of the U.S. Trustee to enforce Jackson Walker's disclosure obligations in his capacity as a public interest watchdog protecting the integrity of the bankruptcy system is well established.  *See Harrington v. Purdue Pharma L.P*, No. 23-124, slip op. at 9 (U.S. June 27, 2024) (the U.S. Trustee is "charged with promoting the integrity of the bankruptcy system for all stakeholders . . . .").  U.S. Trustees have used this statutory authority for decades to address misconduct like Jackson Walker's.  In fiscal year 2023 alone, they brought hundreds of attorney disgorgement and misconduct actions.  Their enforcement activities are reported publicly on a year-by-year basis for all to see.  U.S. Dep't of Just., Reports, Data & Research, https://www.justice.gov/ust/reports-data-research#annual (last visited June 21, 2024). And rather than preventing U.S. Trustees from addressing such misconduct, courts often ask them to investigate and act upon cases of perceived misconduct.  *See, e.g.*, *In re The Roman Catholic Church of the Archdiocese of New Orleans*, No. 20-10846, ECF No. 1574, Order in Resp. to U.S. Trustee Report (Bankr. E.D. La. June 7, 2022) (in response to the U.S. Trustee's court-ordered investigation and filed report, the court removed committee members and issued an order to show cause to determine appropriate sanctions for an attorney's violation of a protective order); *In re Neiman Marcus Grp. Ltd.*, No. 20-32519, ECF No. 1485, Statement of Acting U.S. Truste Regarding Conduct of Marble Ridge Capital LP and Dan Kamensky (Bankr. S.D. Tex. Aug. 29, 2020) (in response to a court order, U.S. Trustee conducted investigation on the misconduct of a committee member and filed a statement of his results).

121.     Indeed, Jackson Walker does not contest that U.S. Trustees have standing to object to professional retention and fees.  JW Opp. at ¶ 80.  Instead, Jackson Walker mischaracterizes the U.S. Trustee's motion as asserting a claim that belongs exclusively to the estate.  This argument lacks merit.

122.     Objections to an estate professional's employment or compensation and motions for sanctions for attorney misconduct are not "claims," nor do they seek relief that only the estate may seek.  Relief is warranted because Jackson Walker deprived other parties of the opportunity to object or seek recusal based on Ms. Freeman's relationship with Judge Jones by failing to disclose it.  Its argument that this failure gives rise solely to a generalized "claim" that may be pressed only by the estates ignores the statutory standing not only of the U.S. Trustee, but of all parties in interest to raise and be heard on any issue in a chapter 11 case, as well as the possibility that others can raise a particularized injury from this violation.

      **a.**     **The U.S. Trustee Has Standing and Authority to Enforce Jackson Walker's Disclosure Requirements to Vindicate the Integrity of the Bankruptcy System.**

123.     As an officer in the Department of Justice, the U.S. Trustee has both constitutional and statutory authority to vindicate federal law.  11 U.S.C. § 307; 28 U.S.C. § 581(a)(7), § 586(a)(3)(A), § 586(a)(3)(I).

124.     Congress enacted the Bankruptcy Code through its constitutional power to establish a "uniform law on the subject of Bankruptcies." U.S. Const. art. I § 8, cl. 4.  Relief accorded under title 11 is "a legislatively created benefit," *United States v. Kras*, 409 U.S. 434, 446–47 (1973), allowed by Congress under that constitutional power.  Congress then created the office of U.S. Trustees and gave them "important oversight and watchdog responsibilities to ensure honesty and fairness in the administration of bankruptcy cases and to prevent and ferret out fraud." H.R. Rep. 99-764, at 18 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5227, 5231.  And Congress conferred standing, through 11 U.S.C. § 307, upon the U.S. Trustee to act in the public interest to ensure that all parties are complying with the laws and rules governing this federally created bankruptcy system.

125.    Reviewing and objecting to professionals' employment and fee applications fall well within the bailiwick of the U.S. Trustee's duties.  *See* 28 U.S.C. § 586(a)(3)(A) (assigning duty to review and comment on applications for compensation and reimbursement under 11 U.S.C. § 330); 28 U.S.C. § 586(a)(3)(I) (assigning duty to monitor and comment on employment applications under 11 U.S.C. § 327).  "Congress has clearly delegated to the UST the discretion to assure that fee awards and expense reimbursements are reasonable. . . ."  *In re Busy Beaver Bldg. Ctrs, Inc.*, 19 F.3d 833, 842 (3d Cir. 1994).  In filing his motion, the U.S. Trustee is simply performing one of his duties.

126.    Multiple appellate courts have recognized the U.S. Trustee's standing to object to professionals' employment or to seek disgorgement of their compensation.  *See*, *e.g.*, *Stanley v. McCormick, Barstow, Sheppard, Wayte & Carruth (In re Donovan Corp.),* 215 F.3d 929, 930 (9th Cir. 2000) (holding U.S. Trustee has standing to pursue appeal of order denying motion to disgorge fees); *In re Geraci*, 138 F.3d 314, 317 (7th Cir. 1998) (citing 11 U.S.C. § 307 in explaining U.S. Trustee's motion to disgorge attorney's fees); *U.S. Trustee v. Price Waterhouse*, 19 F.3d 138, 141 (3d Cir. 1994 ) (Alito, J.) (holding U.S. Trustee has standing to pursue appeal of order overruling objection to professionals' employment); *Michel v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, *Inc.*, 999 F.2d 969, 970 n.2 (6th Cir. 1993) (citing 11 U.S.C. § 307 in explaining U.S. Trustee's objection to employment of professionals).  Jackson Walker cites no case holding that the U.S. Trustee lacks standing to seek sanctions against a bankruptcy professional that violated its duties of disclosure or is somehow precluded from seeking this relief because an estate might also have a cause of action based on the same violation.

127.    That the estate might have a separate claim against Jackson Walker based on the same nucleus of facts does not preclude the U.S. Trustee from vindicating bankruptcy disclosure

requirements.  *Cf. United States v. Miss. Dep't of Pub. Safety*, 321 F.3d 495, 499 (5th Cir. 2003)

(recognizing "authority of the United States to bring suit . . . for the benefit of the public generally

and for [an individual's] benefit specifically" in context of an Americans with Disabilities Act

action).  The government has its own "real and substantial interest" in pursuing an action to

vindicate federal law.  *Id*.  Even if that action results in "victim-specific relief," this does not

"transform the United States into a mere proxy" for that individual.  *Id.; see also EEOC v. Bd. of*

*Supervisors for the Univ. of La. Sys*., 559 F.3d 270, 273 (5th Cir. 2009) (noting "EEOC plays an

independent public interest role that allows it to seek victim-specific relief—even when such relief

could not be pursued by the employee") (citing *EEOC v. Waffle House, Inc*., 534 U.S. 279, 291–

92 (2002)).  Similarly, here, the U.S. Trustee is not acting as the estate's proxy in ensuring

professionals comply with their duties under the Bankruptcy Code and Rules.[19]

128.     Jackson Walker's allegation that Judge Jones pressured Mr. Cavenaugh to have the

law firm issue an "insufficient, inadequate, and misleading" disclosure demonstrates why U.S.

Trustees have separate standing to pursue these claims.  JW Opp. at ¶¶ 56–57.  Debtors' counsel

may fear reprisals from the judge if they pursued recusal on behalf of their clients; they may also

have conflicts of interest because their failure to disclose their connection to the judge implicates

their own violations of professional duties.  By contrast, the U.S. Trustee is an "independent

bankruptcy administrator" who is a "watchdog to prevent not only abuses by debtors, trustees,

debtors-in-possession and attorneys, but also to prevent errors or abuses by bankruptcy judges

themselves."  *The United States Trustee System, Hearing on S-1961 before the Subcomm. on Cts*

---

[19] For this reason, Jackson Walker's argument that the "claims" pursued by the U.S. Trustee are
not preserved by the confirmed chapter 11 plan, JW Opp. at ¶ 98 n.97, is irrelevant.  The U.S.
Trustee is not pursuing an estate cause of action.  And even if the Debtors might be precluded from
pursuing an unpreserved claim, that is not a barrier to the U.S. Trustee's motion for relief as he is
acting in his independent public-interest role.  *Cf. Miss. Dep't of Pub. Safety,* 321 F.3d at 499; *Bd.
of Supervisors for the Univ. of La. Sys.*, 559 F.3d at 273; *Waffle House*, 534 U.S. at 291–92.

*of the Comm. on the Judiciary*, 99th Cong. 163 (1986) (statement of J. Ronald Trost, Chairman of the Comm. on U.S. Trustee and Bankr. Admin., Nat'l Bankr. Conference, and Lawrence King, Chairman of the Legis. Comm., Nat'l Bankr. Conference), 1986 WL 780448 at *127. "What has made the U.S. Trustee effective is the ability to appear and be heard whenever necessary, even in opposition to the bankruptcy judge." *Id.* at 165, 1986 WL 780448 at *128.

129.    Contrary to Jackson Walker's contentions, the U.S. Trustee's request for disgorgement of fees rather than a civil penalty[20] does not transform his sanctions request into an estate cause of action.   Rather, multiple courts—including the Fifth Circuit—have treated the denial of a professional's fees as the proper sanction for failure to comply with the disclosure obligations under the Bankruptcy Code and Rules.  *See Consol. Bancshares, Inc.*, 785 F.2d at 1256 n.7 ("Another ground for denial of fees is failure to comply with the disclosure requirements of the Code and Rules."); *see also Dordevic v. Layng (In re Dordevic)*, 62 F.4th 340, 342 (7th Cir. 2023) (affirming order directing the return of all fees for failure to comply with disclosure obligation); *Stewart*, 970 F.3d at 1267 (holding denial of all fees is "the default sanction" for disclosure violations); *Rome v. Braunstein*, 19 F.3d at 62 (affirming retroactive disqualification and forfeiture of all compensation); *38-36 Greenville Ave. LLC*, 2022 WL 1153123, at *5 (affirming order denying all fees because of undisclosed receipt of post-petition payments by attorney of debtor in possession and violation of law firm's duty of candor).  The U.S. Trustee is thus merely seeking the appropriate sanctions for Jackson Walker's misconduct as recognized by many other courts.

---

[20] The U.S. Trustee did ask for such further relief as may be appropriate (*see* 60(b) Mot., Part V; 60(b) Mot. – Med., Conclusion), which could include a civil penalty.

      **b.**    **The U.S. Trustee's Motion Does Not Assert a "Claim" Nor Is the Right to Seek a Remedy for Jackson Walker's Disclosure Violations Exclusively Held by the Estate.**

130.    Jackson Walker's argument that the U.S. Trustee is asserting a claim that belongs exclusively to the estate is wrong. None of the Bankruptcy Code provisions or Bankruptcy Rules applicable to Jackson Walker's underlying misconduct, as cited in the U.S. Trustee's Motion, provide a "claim" to a party as a remedy for their violation. To the contrary, the statutes and rules simply set the baseline requirements—disinterestedness and disclosure—expected of bankruptcy court judges, mediators, and bankruptcy professionals. A request for sanctions for violating these requirements is not a claim.

131.    Neither section 327 nor 330 limits who may object to the employment or compensation of a bankruptcy professional. As discussed above, the U.S. Trustee has express statutory authority to do so. 11 U.S.C. § 307; 28 U.S.C. § 581(a)(7), § 586(a)(3)(A), § 586(a)(3)(I). And the Bankruptcy Rules require that the U.S. Trustee is provided notice of all employment applications and "all applications for compensation or reimbursement of expenses." Fed. R. Bankr. P. 2002(k), 2014(a). Such notice allows the U.S. Trustee an opportunity to be heard on those applications. Additionally, all creditors—who are also provided the right to raise and appear on any issue in a chapter 11 case, 11 U.S.C. § 1109(b)—must also be provided with notice of "a hearing on any entity's request for compensation or reimbursement of expenses if the request exceeds $1,000," Fed. R. Bankr. P. 2002(a)(6), anticipating their right to be heard on such applications as well.

132.    This is not "[a] situation in which a statute authorizes specific action and designates a particular party empowered to take it," from which this Court should presume exclusivity. *Hartford Underwriters Ins. v. Union Planters Bank*, 530 U.S. 1, 2 (2000). Objecting to employment or compensation is not akin to pursuing an avoidance action or other prosecution of

an estate cause of action. There is no reason to treat a motion to vacate retention and compensation orders and for disgorgement of fees any differently than if the relief were sought at the outset of the law firm's application for retention and compensation.

133.    All the cases cited by Jackson Walker discussing "estate" causes of actions are inapposite because they do not address the standing of the U.S. Trustee to seek relief for disclosure violations. Jackson Walker cites three factually related cases in which a movant was considered to lack standing to seek sanctions against a bankruptcy professional, none of which held the U.S. Trustee lacked standing.[21] *In re Old ANR, LLC*, No. 19-00302, 2019 WL 2179717 (Bankr. E.D. Va. May 17, 2019); *In re SunEdison, Inc.*, No. 16-10992, 2019 WL 2572250 (Bankr. S.D.N.Y. June 21, 2019); *In re SRC Liquidation LLC*, No. 15-10541, 2019 WL 4386373 (Bankr. D. Del. Sept. 12, 2019). Each case involved the same movant, Mar-Bow Value Partners, LLC, that purchased a claim against the respective debtors to enter their bankruptcy cases and seek sanctions against McKinsey Recovery and Transformation Services, who was retained as the respective debtors' turnaround advisor and also competed with Mar-Bow's owner in the consulting industry. Without conceding that the courts' standing analysis was correct, the U.S. Trustee notes that none of the courts treated the violation of a professional's disclosure obligations as an exclusive estate cause of action *per se*; rather, they implicitly recognized that Mar-Bow could have established a personal injury but failed to meet that burden.

134.    Of even greater significance, however, Jackson Walker ignores what all three cases clearly state—that if McKinsey had committed fraud on the court in its disclosure violations, then

---

[21] JW further cites *In re Syntax-Brillian Corp.*, Civ. No. 13-337, 2016 WL 7177615 (D. Del. Dec. 9, 2016), in which a creditor sought sanctions and disgorgement against the debtor's counsel. The bankruptcy court held, and the district court affirmed, that the predicate for the sanctions motion rested on claims that were already settled by the estate's trusts and the debtor's law firm or were released by the confirmed plan. *Id*. at *4 & *12. The decision did not address the U.S. Trustee's standing to pursue sanctions. *See generally id.*

the U.S. Trustee is the appropriate person to investigate and raise those concerns.[22]  Indeed, each further noted that McKinsey had reached a settlement with the U.S. Trustee in the cases before those courts, and that the settlement had expressly excluded any allegations of fraud, which the courts all agreed the U.S. Trustees were free to pursue.[23]

> ### c. Jackson Walker Cannot Hide Behind Standing Arguments Because This Court Has Independent Authority to Sanction It for Its Nondisclosures.

135.    Jackson Walker's attack on the U.S. Trustee's standing is not only meritless, but also ineffective to protect Jackson Walker from sanctions.  That is because this Court has authority to reduce fees and order disgorgement *sua sponte*, and has an independent duty to do so.

136.    Because of "the potential for conflicts of interest" between attorneys seeking compensation and the estate, bankruptcy courts have "an independent duty" to examine compensation requests "even absent objections."  *Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d at 843 (quotations omitted); *see also Dordevic*, 62 F.4th at 342–43 (7th Cir. 2023) ("[G]iven Congress's directive, bankruptcy courts have an inescapable statutory duty to review fee arrangements."); *Stewart*, 970 F.3d at 1258 ("The disclosure requirements enable bankruptcy judges to perform core and traditional role of overseeing lawyers who represent bankruptcy debtors"); *Consol. Bancshares,* 785 F.2d at 1254 ("[T]he basic premise of the Bankruptcy Code [is] that the bankruptcy court has broad supervisory powers over professional persons who render services for the estate."); *Herrera v. Dishon*, No. 4:15-cv-227, 2016 WL 7337577, at *1 (S.D. Tex. Dec. 16, 2016) ("[The professional] does contest the standing of the parties objecting to its fees, but this issue need not be labored. The bankruptcy court has an independent duty to review fee applications

---

[22] *Old ANR*, 2019 WL 2179717 at *6 n.22; *SRC Liquidation*, 2019 WL 4386373 at *2 & *5; *SunEdison*, 2019 WL 2572250 at *10.
[23] *Old ANR*, 2019 WL 2179717 at *3 & *6 n.22; *SRC Liquidation*, 2019 WL 4386373 at *5; *SunEdison*, 2019 WL 2572250 at *10.

of professionals even in the absence of an objection.") (affirming denial of all fees based in part on failure to disclose).

137.    And, as discussed above, bankruptcy courts' supervisory authority over fees includes broad discretion to order disgorgement for disclosure violations, in addition to inherent authority to impose sanctions. *See supra* Part II.F.  The court has the power to impose these sanctions *sua sponte. See, e.g., In re 38-36 Greenville Ave. LLC*, No. 21-2164, 2022 WL 1153123, at *4 (3d Cir. Apr. 19, 2022) (affirming *sua sponte* disgorgement order against law firm based on its "repeated violations of the Bankruptcy Rules and the Code, along with counsel's lack of candor"); *Friendly Fin. Discount Corp. v. Tucker (In re Tucker)*, 224 F.3d 766, 2000 WL 992488, at *3 (5th Cir. June 28, 2000) ("§ 105 authorizes the bankruptcy court to, sua sponte, 'take any action or make any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.'") (quoting 11 U.S.C. § 105).

138.    Because the Court has the independent power and duty to supervise attorneys who practice before it and impose sanctions, including disgorgement of fees, Jackson Walker's attempt to evade sanctions through a misdirected attack on the U.S. Trustee's standing cannot protect it.

**2.      The Releases in the Confirmed Plan Do Not Bar the U.S. Trustee's Motions.**

139.    Jackson Walker contends that the relief sought in the 60(b) Motions has been released or barred by the confirmed Plan, but those releases do not apply here. *See* JW Opp. at ¶¶ 90–98.  Moreover, the Plan in this case does not contain exculpations.

**a.      The U.S. Trustee Can Raise, and this Court Should Address, Jackson Walker's Misconduct Regardless of Whether the Estate Has Claims Against Jackson Walker.**

140.    As explained above in Part II.G.1.b, the U.S. Trustee does not assert "estate claims" that could be released by the Debtors under the Plan because he has independent statutory authority to enforce federal law under 28 U.S.C. § 581(a)(7) and 11 U.S.C. § 307.  As a result, any release

of claims the Debtors provided under the Plan does not immunize Jackson Walker from the U.S. Trustee's request for vacatur of the retention and compensation orders nor his request for sanctions for violation of the Bankruptcy Code, Bankruptcy Rules, Disciplinary Rules, and Jackson Walker's fiduciary duties.

141.     Further, adopting Jackson Walker's expansive interpretation of the Plan's releases releasing claims related to its fees (*see* JW Opp. at ¶¶ 90–91) would prevent any party in interest from objecting to professionals' final fee applications, which are filed and approved after entry of the confirmation order.  This would be nonsensical, resulting in perfunctory approval of all final fee applications and also prevent the U.S. Trustee from performing his mandated-duties.

> **b.     The U.S. Trustee's Right to Hold Jackson Walker Accountable for its Misdeeds Is Carved Out from the Nondebtor Releases Under the Plan and Confirmation Order.**

142.     Jackson Walker contends that third-party releases and exculpations in the Plan protect it from the United States Trustee's motions, but the nondebtor releases do not apply to the U.S. Trustee, and there are no exculpations here.  *See* JW Opp. at ¶¶ 90–91.  The Plan contains nondebtor releases by holders of Claims.  *See* Plan, Art. VIII.F.5.  Neither bars the U.S. Trustee's motions because the confirmation order carves out the United States from the Plan's releases:

> For the avoidance of doubt, *the United States* and the State of Texas *opt out of the releases* provided in Section VIII.F of the Plan and *each is not a Releasing Party.*

Confirmation Order, ECF No. 353 at ¶ 76 (emphasis added).

143.     As a result, under the Confirmation Order, nothing in the Plan or Confirmation Order bars the relief sought in the U.S. Trustee's Motion.

c. **The U.S. Trustee Is Not a "Releasing Party" Under the Plain Language of the Plan.**

144.    Even without an express carveout for the United States in the Confirmation Order, the Plan's nondebtor releases do not apply to the U.S. Trustee.   Jackson Walker appears to acknowledge that the U.S. Trustee is not a Releasing Party under the Plan.  *See* JW Opp. at ¶ 92. Indeed, only the following are "Releasing Parties:"

> "Releasing Parties" means collectively, and in each case in its capacity as such: (a) the CRO; (b) the Committee and the members thereof; (c) the DIP Lender; (d) 4E Global; (e) with respect to each of the foregoing parties in clauses (a) through (d), such Entities' parents, owners, affiliates, subsidiaries, assigns, agents, or Representatives; and (f) all Holders of Claims or Interests; provided that any Holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) Files an objection to the releases contained in the Plan by the Plan Objection Deadline, or (z) timely votes to reject the Plan, shall not be a "Released Party."

Plan, Art. I.A(80) (defining "Releasing Parties").  None of the categories in this definition apply to the U.S. Trustee.

d. **The Releases Do Not Apply Because They Carve Out Acts or Omissions that Constitute Actual Fraud, Willful Misconduct, or Gross Negligence.**

145.    Jackson Walker contends that only its own actual fraud, willful misconduct, or gross negligence would result in the U.S. Trustee's motions being carved out of the Plan releases.  But even if the Court accepts that only Ms. Freeman, and not Jackson Walker, engaged in such conduct, that reading is inconsistent with the language of the Plan.  *See* JW Opp. at ¶ 98.

146.    The Plan's nondebtor releases include a carveout for "any claim or Causes of Action *related to an act or omission* that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence." Plan, Art. VIII.F.5. (emphasis added).  This broad carveout is not limited to Jackson Walker's acts or omissions but encompasses "*any* claim or Causes of Action related to an act or omission that . . . constituted actual fraud, willful misconduct, or gross negligence." Plan, Art. VIII.F.5. (emphasis added).  The

carveout does not state that it applies only to claims "*arising out*" of an act or omission nor only to claims "related to the *exculpated/released party's act or omission*."  Rather, the carve-out broadly includes claims *related to any* act or omission that constitutes actual fraud, willful misconduct, or gross negligence—which includes Ms. Freeman's acts and omissions, even if (counterfactually) Jackson Walker did not itself engage in actual fraud, willful misconduct, or gross negligence. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 80 (2023) (holding that a debtor's debt that was obtained through her partner's fraudulent acts were nondischargeable because the language of the statute "focuses on an event that occurs without respect to a specific actor, and therefore without respect to any actor's intent or culpability.") (internal quotations omitted).

        i.   *Ms. Freeman's Alleged Conduct Constitutes Actual Fraud, Willful Misconduct, and Gross Negligence.*

147.    Ms. Freeman's conduct constitutes, at the very least, gross negligence and willful misconduct.  Under Texas law, willful misconduct is "generally equated with gross negligence," which has two elements.  *Fath v. CSFB 1999-C1 Rockhaven Place Ltd. P'ship*, 303 S.W.3d 1, 6 (Tex. App.—Dallas 2009).  "First, viewed objectively from the actor's standpoint, the act or omission complained of must depart from the ordinary standard of care to such an extent that it creates an extreme degree of risk of harming others." *Id*.

148.    As an experienced bankruptcy professional, Ms. Freeman was aware of the risks of violating disclosure obligations and requirements to be disinterested and conflict free—and to remain so throughout the case—under the Bankruptcy Code and Rules and the Disciplinary Rules consistent with her professional and fiduciary duties.  Indeed, failing to disclose a conflict of interest can be considered willful misconduct rendering a release or exculpation inapplicable.  *See, e.g.*, *eToys, Inc.*, 331 B.R. at 187 ("The allegations in Alber's Motions are, however, that the parties had actual conflicts of interest which they knowingly failed to disclose at the time of their retention

and throughout the case.  If this is true, the Court concludes that the exculpation clause would not protect the Respondents because it constitutes willful misconduct."); *In re New River Dry Dock, Inc.*, 451 B.R. 586, 589–90 (Bankr. S.D. Fla. 2011) ("It would be improper to allow fees which were obtained through dishonesty and non-compliance with the Bankruptcy Code only because a plan has been confirmed.  This is especially true where, as here, the confirmed Plan specifically carves out an exception to the clause releasing pre-confirmation professionals for 'gross-negligence or willful misconduct.'"), *aff'd sub nom. Denison v. Marina Mile Shipyard, Inc.*, No. 10-62522, 2012 WL 75768 (S.D. Fla. Jan. 10, 2012), *aff'd sub nom. New River Dry Dock, Inc.*, 497 F. App'x at 888.  *Cf. Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 41 (1st Cir. 1999) (holding that, given that the release would protect attorneys from malpractice claim arising from undisclosed conflict of interest, "release provision itself may constitute probative evidence of a fraudulent intent" that would justify vacating an order under Rule 60(b)).

149.    Ms. Freeman's alleged actions here may also constitute actual fraud.  Under Texas law, common law fraud has the following elements: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.  *See Hill v. New Concept Energy, Inc.* (*In re Yazoo Pipeline Co.*), 459 B.R. 636, 650 (Bankr. S.D. Tex. 2011) (quoting *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).

150.    By failing to disclose publicly her relationship in this matter, Ms. Freeman misled parties in interest just as if she had made an affirmatively fraudulent statement.  *See United States v. Gellene*, 182 F.3d 578, 587 (7th Cir. 1999) ("[T]he omission of material information in a

bankruptcy filing impedes a bankruptcy court's fulfilling of its responsibilities just as much as an explicitly false statement.") (quotation marks omitted) (affirming attorney's conviction for bankruptcy fraud).  When Ms. Freeman omitted this material information and did not cause Jackson Walker to make a disclosure about her relationship, she knew or should have known that parties in interest, including the U.S. Trustee, would rely on the incomplete representation and not object to Jackson Walker's retention and compensation based on its false disclosure.

151.  Moreover, Ms. Freeman's alleged actions were a fraud on the Court.  "To establish fraud on the court, 'it is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision.'"  *First Nat'l Bank of Louisville v. Lustig*, 96 F.3d 1554, 1573 (5th Cir. 1996) (quoting *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978)).  Ms. Freeman's concealment of her financial and romantic co-habiting relationship with Judge Jones was "designed to improperly influence the court."  *See Lustig*, 96 F.3d at 1573. Although the Fifth Circuit has stated that "nondisclosure to the court of facts allegedly pertinent to the matter before it will not ordinarily rise to the level of fraud on the court," *id.*, this is no ordinary case.  It involves not just the failure to disclose a material fact, but the nondisclosure by an estate-paid professional and officer of the Court of a romantic relationship with the presiding judge that would either require his recusal or preclude her firm's retention.

152.  Disclosure and transparency by all participants in the bankruptcy process are fundamental tenets, and unremarkably courts have found that bankruptcy professionals' failure to disclose a disqualifying connection is a fraud upon the court.  *See Pearson*, 200 F.3d at 35–41 (holding that attorney's false disclosure which denied any connection with creditors could support a finding that attorney had committed a fraud on the court); *eToys, Inc.*, 331 B.R. at 188 ("In this case it is alleged that the professionals did not disclose conflicts of interest that would have barred

their retention.  If this is true, it would constitute a fraud on the Court warranting relief even though more than a year has passed since the professionals were retained and their fees approved."); *Benjamin's-Arnolds, Inc.*, 1997 WL 86463, at *9 ("[T]he Court concludes that an attorney's intentional failure to disclose a conflict of interest in violation of § 327 and Rule 2014 amounts to fraud upon the bankruptcy court and an abuse of the judicial process.").

153.    Accordingly, the relief sought by the U.S. Trustee is "related to" an "act or omission [by Ms. Freeman] . . . [that] constituted actual fraud, willful misconduct or gross negligence," Plan, Art. VIII.F.5, and thus, it is subject to the carveout in the Plan's nondebtor releases.

154.    The full scope, veracity, and significance of the alleged misconduct will be further understood once the U.S. Trustee completes discovery.

> ii.    *Jackson Walker's Actions Also Constitute Actual Fraud, Willful Misconduct, or Gross Negligence.*

155.    The U.S. Trustee's motions also are carved out of the releases because Jackson Walker's conduct constitutes actual fraud, willful misconduct, or gross negligence.  Jackson Walker failed to disclose its connection to Judge Jones both at the outset of this case and on an ongoing basis as the Bankruptcy Rules require, which resulted in willful misconduct, gross negligence, and fraud, just as Ms. Freeman committed.  *See supra* Part II.C.2–3.  Jackson Walker contends that it lacked the "actual" knowledge required for establishing actual fraud, willful misconduct, or gross negligence before March 2022.  This brushes aside Jackson Walker's admitted knowledge of Ms. Freeman's past relationship with Judge Jones since March 2021.  Even if Jackson Walker's claims of ignorance are true, Ms. Freeman's knowledge of her relationship is imputed to the firm, regardless of whether or when any other members of the firm learned of the relationship.  *See supra* Part II.C.1.a–b.  Thus, the knowledge requirements for claims regarding actual fraud, willful misconduct and gross negligence are met.

      **e.**      **The U.S. Trustee Does Not Seek to Modify the Plan or Confirmation Order.**

156.    Jackson Walker argues that section 1144 bars the U.S. Trustee's requested relief but misreads the applicable Fifth Circuit law.  First, the debtor releases, the nondebtor releases, and the exculpations do not apply to the U.S. Trustee, as explained above.  *See supra* Part II.G.2.b–c.  As a result, the Plan and Confirmation Order are not disturbed through the exclusion of the U.S. Trustee's motion in this matter.

157.    Second, even if the Court finds that any release applies to the relief sought in the U.S. Trustee's motion, it is unenforceable under Fifth Circuit law without the need for modification of the Plan and are not subject to res judicata.  The Fifth Circuit holds that "§ 524(e) categorically bars third-party exculpations absent express authority in another provision of the Bankruptcy Code."  *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 436 (5th Cir. 2022) (citing *Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm.* (*In re Pac. Lumber Co.*), 584 F.3d 229, 252–53 (5th Cir. 2009)), *petitions for cert. filed*, No. 22-631 (Jan. 5, 2023) and No. 22-669 (Jan. 16, 2023).  *See also Purdue*, slip op. at 19 (holding that "the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants"); *QuarterN. Energy LLC v. Atl. Maritime Servs. LLC* (*In re Fieldwood Energy III LLC*), No. 22-00855, 2023 WL 2142661, at *9 (S.D. Tex. Feb. 16, 2023) ("The Fifth Circuit has repeatedly expressed its aversion to non-debtor releases and permanent injunctions.").

158.    The Fifth Circuit has identified only two sources of authority to exculpate nondebtors: (1) the channeling injunction for asbestos claims (*see* 11 U.S.C. § 524(g)) and (2) the "limited qualified immunity to creditors' committee members for actions within the scope of their

statutory duties" (*see* 11 U.S.C.§ 1103(c)). *See Highland Cap. Mgmt.*, 48 F.4th at 437. Neither

exception applies to estate-paid professionals, such as Jackson Walker. In other words, "precedent

and § 524(e) require [that] any exculpation in a Chapter 11 reorganization plan be limited to the

debtor, the creditors' committee and its members for conduct within the scope of their duties, 11

U.S.C. § 1103(c), and the trustees within the scope of their duties . . . ." *Id*. at 437. In *Highland*

*Capital Management*, the Fifth Circuit held that "the exculpation of non-debtors here was

unlawful" and struck other nondebtor exculpations from the plan, including "professionals retained

by Highland Capital and the Committee . . . ." *Id*. at 438. *See also Bouchard v. Bouchard Transp.*

*Co.* (*In re Bouchard Transp. Co.*), No. 21-2937, 2023 WL 1797907, at *3 (S.D. Tex. Feb. 7, 2023)

(remanding the case to the bankruptcy court to modify a confirmed plan by striking nondebtors

from the exculpation in accordance with *Highland Cap. Mgmt*.).

159.     The Fifth Circuit has declined to apply res judicata to releases that are contrary to

section 524, making it irrelevant that a plan was confirmed and became effective. Despite Jackson

Walker's attempt to distinguish the case, the Fifth Circuit's decision in *Applewood Chair Co. v.*

*Three Rivers Planning & Development District* (*In re Applewood Chair Co.*,) is instructive. 203

F.3d 914 (5th Cir. 2000). In that case, the bankruptcy court confirmed a plan of reorganization

with nondebtor releases benefiting "[the debtor's] officers, directors and principals from any debt

owed by those individuals to third parties." *Id.* at 917. After confirmation, a creditor began

foreclosure proceedings against the guarantors' real property when the purchasers that had

assumed the original debt defaulted. *Id.* The guarantors notified the creditor that the claims were

discharged under the plan, so the creditor sought clarification on whether the nondebtor claims had

been released under the plan. *Id.*

160.     On appeal, the Fifth Circuit acknowledged that it had previously held that "the confirmation of a clear and 'unambiguous plan' of reorganization that 'expressly released' a third-party guarantor has a res judicata effect on a subsequent action against the guarantor who is also a creditor." *Id.* at 918 (quoting *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1049–50 (5th Cir. 1987)).[24] But unlike *Shoaf* where there was an explicit release of a specific party for a specific guaranty, the debtor's plan contained only a general release for third parties.  Ultimately, the court decided that it would be guided by the "general rule codified in § 524" that the discharge of a debtor does not affect the liability of any other entity and that the "abrogation of the general rule codified in § 524" could only occur if there were "specific" language releasing the nondebtor.  203 F.3d at 919–20.  Moreover, despite Jackson Walker's assertion that *Applewood Chair's* reasoning only applies to the release of guarantor claims (*see* JW Opp. at ¶¶ 96–97), courts have declined to enforce other provisions in confirmed plans that were contrary to governing law.  *See also Hernandez v. Larry Miller Roofing, Inc.*, 628 F. App'x 281, 287–88 (5th Cir. 2016), as revised (Jan. 6, 2016) (holding that the release provisions were "generic" and "not sufficiently specific to release claims" against a corporate officer and that res judicata did not apply); *Enter. Fin. Grp. v. Curtis Mathes Corp.*, 197 B.R. 40, 46 (E.D. Tex. 1996) (declining to apply res judicata to a confirmed plan's retention of jurisdiction provision that was contrary to the Bankruptcy Code and never appealed).

161.     Here, the language in the nondebtor release is generic, releasing Jackson Walker:

> from any and all Claims and Causes of Action . . . based on or relating to, or in
> any manner arising from, . . . the Debtor . . . the Debtor's in- or out-of-court

---

[24] As the Fifth Circuit stated in *Applewood Chair*, the decision in *Shoaf* was limited.  *See* 203 F.3d at 918.  Indeed, unlike in *Applewood Chair* and this case, the nondebtor release in *Shoaf* contained a "specific paragraph for the release of Shoaf's guaranty" and "omitted a paragraph that provided a general release for non-debtors."  *Id.* at 919.  In this case, both the exculpations and nondebtor releases are general and release numerous nondebtors without naming specific parties.  Thus, *Shoaf* is inapposite.

> restructuring efforts, any Avoidance Actions . . . any intercompany transactions between or among the Debtor and an Affiliate, the Chapter 11 Case, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the DIP Loan, the Disclosure Statement, the Plan, the Plan Supplement, the 4E Global Settlement, or any transaction, contract, instrument, release, or other agreement or document . . . created or entered into in connection with the DIP Loan, the Disclosure Statement, the Plan, the Plan Supplement, the 4E Global Settlement, the Chapter 11 Case, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

*See* Plan, Art. VIII.F.5.  To the extent the releases can be applied to the U.S. Trustee, they are not sufficiently specific to release Jackson Walker here.

> ### f.   Equitable Estoppel Precludes Jackson Walker's Defenses Due to Its Ongoing Failures to Disclose and Continuing Misrepresentations.

162.     "Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984).  It applies where "one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act. . . ." *Id.* (quoting Restatement (Second) of Torts § 894(1) (1979) (the "Restatement of Torts")).  *See also Lovett v. Cardinal Health, Inc.* (*In re Diabetes Am., Inc.*), 485 B.R. 340, 356 (Bankr. S.D. Tex. 2012) ("The elements of equitable estoppel in the Fifth Circuit are: '(1) a material misrepresentation (or concealment), (2) made with actual or constructive knowledge of the true facts, (3) with intent that the misrepresentation be acted upon by (4) a party without true knowledge or means of knowledge of the true facts, (5) who detrimentally relies or also acts on the misrepresentation.'").  "[T]he party claiming the estoppel must have relied on its adversary's conduct 'in such a manner as to change his position for the worse' and that reliance must have

been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Heckler*, 467 U.S. at 59 (citations omitted).

163.   Estoppel "does not require any intent to deceive by the party to be estopped." *Minard v. ITC Deltacom Commc'ns, Inc.*, 447 F.3d 352, 358–59 (5th Cir. 2006) (citing the Restatement of Torts § 894(1)).   Estoppel "is appropriate even where 'the one making the representation believes that his statement is true,'" and even if "the person making the representation exercised due care in making the statement." *Id.* (quoting the Restatement of Torts and citing *Heckler* for the proposition that "[i]n adopting the Restatement's estoppel principles, the Supreme Court evidently intended that they should be read and applied in light of the Restatement's explanatory provisions").

164.   Here, all the elements of equitable estoppel are met.   Jackson Walker's failure to disclose the relationship between Judge Jones and Ms. Freeman was material, and Jackson Walker was deemed to have actual knowledge of this fact through its agent, Ms. Freeman.   S*ee supra* Part II.C.1.a–b.   Discovery will establish whether Ms. Freeman and Jackson Walker intended for other parties to act or not to act on this omission.   But the omission caused the U.S. Trustee and parties in interest not to act: they did not object to Jackson Walker's retention and compensation based on the lack of disinterestedness because they did not know this material fact and could not have known due to the secretive nature of the relationship.   Thus, Jackson Walker is equitably estopped from relying on exculpations and releases that it obtained through materially deficient disclosures and misleading representations about conflicts and disinterestedness.

> ### g.   Jackson Walker May Not Rely on the Exculpations and Releases Because It Has Unclean Hands.

165.   The Supreme Court recognizes the "equitable maxim that 'he who comes into equity must come with clean hands.'" *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,

324 U.S. 806, 814 (1945).  The "unclean hands" doctrine "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."  *Id*. "That doctrine is rooted in the historical concept of courts of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith."  *Id*.  And as the Fifth Circuit has long recognized, "[b]ankruptcy courts are courts of equity."  *Nikoloutsos v. Nikoloutsos* (*In re Nikoloutsos*), 199 F.3d 233, 236 (5th Cir. 2000).

166.    Equity requires that a litigant "shall have acted fairly and without fraud or deceit as to the controversy in issue."  *Precision Instrument*, 324 U.S. at 814–15 (citing *Keystone Driller Co. v. Gen. Excavator Co*., 290 U.S. 240, 245 (1933); *Johnson v. Yellow Cab Transit Co*., 321 U.S. 383, 387 (1944); 2 John Norton Pomeroy & Spencer W. Symons, Equity Jurisprudence §§ 397–99 (5th ed. 1941); *see also Henderson v. United States*, 575 U.S. 622, 625 n.1 (2015) ("The unclean hands doctrine proscribes equitable relief when, but only when, an individual's misconduct has 'immediate and necessary relation to the equity that he seeks.'") (internal citation omitted).

167.    A litigant's "misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character" for the unclean hands doctrine to apply.  *Precision Instrument*, 324 U.S. at 815.  Rather, "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause" to invoke the doctrine.  *Id.*

168.    And the Supreme Court has held that the unclean hands doctrine is of greater importance where a suit concerns public interests as well as private interests of litigants.  *Id*.  This is because, "if an equity court properly uses the [unclean hands] maxim to withhold its assistance

in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public." *Id*.

169. The Fifth Circuit has applied the unclean hands doctrine against claims that do not arise in equity. *Kuehnert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir. 1969) (holding that the doctrine "expresses a general principle equally suited to damage actions"). In *Kuehnert*, the Fifth Circuit held that unclean hands precluded a plaintiff's recovery in a securities fraud action where the plaintiff purchased stock based on false insider information rather than disclosing information as required by statute. *Id*. The Fifth Circuit determined that policy concerns supported applying unclean hands under those circumstances because it better promoted "the objective of the securities laws by increasing the protection to be afforded the investing public." *Id*.; *accord James v. DuBreuil*, 500 F.2d 155, 160 (5th Cir. 1974).

170. Bankruptcy courts likewise have held that violations of disclosure requirements constituted unclean hands. *See, e.g.*, *In re Riley*, 486 B.R. 711, 716–18 (Bankr. D.S.C. 2013) (holding that the debtor's failure to truthfully disclose the extent of his assets warranted denial of his homestead and wildcard exemptions under the unclean hands doctrine); *In re Lafferty*, 469 B.R. 235, 246 (Bankr. D.S.C. 2012) ("Debtors both have unclean hands as a result of their conduct in and relating to this bankruptcy proceeding and should not be entitled to benefit from their wrongful conduct by recognition of a homestead exemption . . . .").

171. Every aspect of this litigation is rooted in the fact that Jackson Walker behaved without clean hands. Jackson Walker omitted material facts and violated disclosure obligations, putting the perceived fairness of the judicial system in jeopardy. The relationship at the center of this problematic behavior has already resulted in a Fifth Circuit Ethics Complaint against a bankruptcy judge who then resigned. The lack of disclosure and disregard for the requirements of

the Bankruptcy Code and Rules, Disciplinary Rules, and Local Rules constitute "unclean hands" directly related to the relief Jackson Walker now seeks—*preemptive* immunity from liability based on releases and exculpations.  The Court should not condone such behavior by permitting Jackson Walker to rely on releases and exculpations that it obtained through inequitable conduct.

## III.   CONCLUSION

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court overrule Jackson Walker's objections and  (1) vacate the orders approving Jackson Walker's employment and granting Jackson Walker's interim and final fee applications, (2) sanction Jackson Walker for its violations of the Bankruptcy Code, Bankruptcy Rules, their fiduciary duties, the Local Rules, and the Disciplinary Rules by ordering the return of any paid fees and expenses, and (3) grant such other and further relief as this Court deems just and appropriate.

Date: July 1, 2024

Respectfully Submitted,

KEVIN M. EPSTEIN
UNITED STATES TRUSTEE
REGION 7, SOUTHERN AND WESTERN
DISTRICTS OF TEXAS

By: */s/ Millie Aponte Sall*

RAMONA D. ELLIOTT
Deputy Director/
General Counsel
NAN ROBERTS EITEL
Associate General Counsel
Fed. ID No. 561266
DANIELLE PHAM
Trial Attorney
Department of Justice
Executive Office for
United States Trustees
Washington, D.C. 20530
(202) 307-1399 – Telephone

MILLIE APONTE SALL
Assistant U.S. Trustee
Tex. Bar No. 01278050/Fed. ID No. 11271
VIANEY GARZA
Trial Attorney
Tex. Bar No. 24083057/Fed. ID No. 1812278
ALICIA BARCOMB
Trial Attorney
Tex. Bar No. 24106276/Fed ID No. 3456397
515 Rusk, Suite 3516
Houston, Texas 77002
(713) 718-4650 – Telephone
(713) 718-4670 – Fax
Email: millie.sall@usdoj.gov
          vianey.garza@usdj.gov
          alicia.barcomb@usdoj.gov